# UNITED STATES CARTRIDGE CO. v. UNITED STATES.

## No. H–522.

Court of Claims.
April 6, 1931.

H. Le Baron Sampson, of Boston, Mass. (Jay B. Angevine, of Boston, Mass., on the brief), for plaintiff.

Fred K. Dyar and Isadore Graff, both of Washington, D. C., Charles B. Rugg, Asst. Atty. Gen. (Ottamar Hamele, of Washington, D. C., on the brief), for the United States.

Argued before BOOTH, Chief Justice, and WILLIAMS, LITTLETON, and GREEN, Judges.

BOOTH, Chief Justice.

This case presents the determination, under the revenue laws and regulations of the Commissioner of Internal Revenue, of plaintiff's tax liability for the year 1918.

The plaintiff is a Massachusetts corporation and during the late World War was engaged in the manufacture of ammunition to be used both in this country and abroad. In making its tax return for the calendar year 1918 two contentions arose as to the proper valuation of its inventory for the year and the denial by the Commissioner of a deduction from gross income for the year of the cost of buildings erected upon leased grounds.

No jurisdictional question arises and the case depends solely upon the issues stated. The facts which follow must be stated in detail.

The plaintiff's books of account were kept upon an accrual basis. On March 19, 1917, the Maxim Munitions Corporation, a Delaware corporation, entered into a contract with the Officine di Villar Perosa, an Italian corporation acting for the Italian government, hereafter referred to as the Italian contract, for the manufacture and delivery of 250,000,000 9-millimeter cartridges. This contract was amended May 31, 1917, and December 14, 1917, the last amendment reducing the quantity of ammunition to be delivered to 125,000,000 cartridges. All of this ammunition was of special design and intended for use by Italy in the war. The Maxim Corporation was required to give bond for the faithful performance of the contract and received from Italy an advanced payment of $1,531,250 for the ammunition to be delivered under the contract.

In order to procure the exacted bond the Maxim Corporation deposited with the Maryland Casualty Company, the Fidelity & Deposit Company of Maryland, and the United States Fidelity & Guaranty Company of the same state, the entire sum so advanced, in such proportions as to secure each of the companies against loss, and later on, when the quantity of cartridges to be delivered was reduced one-half, the surety companies reduced their collateral one-half, and this amount was returned to the Italian corporation and retained by it.

On October 5, 1917, the plaintiff entered into a written contract with the Maxim Corporation, by the terms of which the plaintiff agreed to manufacture and deliver the ammunition in the quantities stipulated and in accord with the terms of the existing contract between the Maxim Corporation and the Italian government. In other words, the plaintiff took over the Maxim contract. The plaintiff acquired materials, manufactured and delivered a large quantity of cartridges, and had on hand materials and undelivered cartridges involved herein, when on November 22, 1918, the Italian authorities canceled the contract of March 19, 1917, between the Maxim Corporation and Italy, and thereafter declined to accept any additional deliveries whatever. Some dispute arose as to the authority of those acting to cancel, an unessential point, but the plaintiff company accepted cancellation as accomplished, and on November 26, 1918, discontinued the manufacture of cartridges entirely. It is conceded by the parties that at the time of the cancellation of the Maxim contract the unworked and finished materials then on hand in plaintiff's plant applicable to the Maxim contract possessed a market value of $79,297.11 and a cost value of $274,659.-78. See finding 20. The plaintiff did not realize the cost value of the materials. Following the cancellation of the Maxim contract negotiations ensued for a settlement with the Italian government for the loss occasioned thereby, but neither the plaintiff nor the Maxim Corporation ever obtained any sums in addition to the advance payment made to the Maxim Corporation as heretofore noted. In virtue of waivers filed by the plaintiff, its tax liability, due to audits and examination of its books of account in relation to this particular contract and other transactions to follow, was not finally determined until January 16, 1926, when the Commissioner declined to allow the plaintiff to value its inventory for the year at the market value of the materials on

hand to perform its contract with the Maxim Corporation, i. e., $79,297.11, and instead valued its inventory at cost, i. e., $274,659.78.

During the calendar year 1918 the Maxim Munitions Corporation was insolvent, it could not have possibly performed its Italian contract nor pay the plaintiff for its unworked material and finished munitions. It was indebted to the plaintiff in the sum of $300,000, and doubtless, because of its insolvency and indebtedness to the plaintiff, the contract involved herein was made. On May 29, 1919, a petition of involuntary bankruptcy was filed against the Maxim Corporation, and on June 18, 1919, it was adjudicated a bankrupt.

Sec. 203 of the Revenue Act of 1918 (40 Stat. 1057, 1060) provides as follows: "That whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income."

Section 234 of the Revenue Act of 1918 (40 Stat. 1077) provides in part as follows:

"Sec. 234(a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions: * * *

"(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise. * * * "

Article 1584 of Regulations 45, the first regulations promulgated under the act of 1918, reads as follows:

"Art. 1584. Inventories at market.— Under ordinary circumstances 'market' means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which ordinarily purchased by the taxpayer and is applicable in the cases (a) of goods purchased and on hand, and (b) of basic elements of cost (materials, labor, and burden) in goods in process of manufacture and in finished goods on hand; exclusive, however, of goods on hand or in process of manufacture for delivery upon firm sales contracts at fixed prices entered into before the date of the inventory. * * * "

Articles 1612 and 1614 of Regulations 65, in force in 1926 when the additional taxes now complained of were assessed and paid, read as follows:

"Art. 1612. Valuation of inventories— The act provides two tests to which each inventory must conform: (1) It must conform as nearly as may be to the best accounting practice in the trade or business and (2) it must clearly reflect the income. * * * An inventory that can be used under the best accounting practice in a balance sheet showing the financial position of the taxpayer can, as a general rule, be regarded as clearly reflecting his income.

"The basis of valuation most commonly used by business concerns and which meets the requirements of the revenue act is (a) cost or (b) cost or market, whichever is lower. (For inventories by dealers in securities, see article 1615.) Any goods in an inventory which are unsalable at normal prices or unusable in the normal way because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes, including secondhand goods taken in exchange, should be valued at bona fide selling prices less cost of selling whether basis (a) or (b) is used, or if such goods consist of raw materials or partly finished goods held for use or consumption, they shall be valued upon a reasonable basis, taking into consideration the usability and the condition of the goods; but in no case shall such value be less than the scrap value. * * *

"Art. 1614. Inventories at market.—Under ordinary circumstances, and for normal goods in an inventory, 'market' means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer, and is applicable in the cases (a) of goods purchased and on hand, and (b) of basic elements of cost (materials, labor, and burden) in goods in process of manufacture and in finished goods on hand; exclusive, however, of goods on hand or in process of manufacture for delivery upon firm sales contracts (i e., those not legally subject to cancellation by either party) at fixed prices entered into before the date of the inventory, which goods must be inventoried at cost. * * * "

The plaintiff insists that it was entitled under the regulations to value its inventory at cost or market, whichever was lower. The defendant contends that a lawful exception prevails as to this option granted by the regulations in the case "of goods on hand or in process of manufacture for delivery upon

firm sales contracts (i. e., those not legally subject to cancellation by either party) at fixed prices entered into before the date of inventory, which goods must be inventoried at cost." The purpose of inventories in a business enterprise such as we have here is apparent, and the Commissioner's regulations as to a valuation of the same on the basis of cost or market value, whichever is lower, were clearly to ascertain accurately annual income in view of fluctuating values of merchandise on hand, at the beginning and close of the year. Mutual Chemical Co. of America, 12 B. T. A. 578. If, however, the taxpayer possesses a contract stipulating a fixed price for the commodity to be manufactured, he is, as pointed out in the opinion just cited, "protected against any reduction in value occasioned by declining market prices." The single exception to the above rule is applicable only to contracts to manufacture and deliver a completed article subject to cancellation by either party. Of course, if a taxpayer is protected against loss of value of unworked materials by the terms of a fixed contract of sale, and obviously such would be the case in firm sales contracts, the valuation of his inventories as related to the contract is not dependable upon cost or market, whichever is lower, and actual income is not to be ascertained by according to inventories the procedure set forth in the regulations where no such condition obtains.

The intent of the regulations, aside from the language used, is manifestly to apply them as the actual situation presents itself to the Commissioner. When the plaintiff's tax liability was finally determined by the Commissioner, it was known to him that the contract between plaintiff and the Maxim Munitions Corporation had been canceled before the expiration of the year 1918. It was also known to him that the Maxim Corporation was insolvent and had been adjudicated a bankrupt, and that plaintiff had not been able to realize cost or anyway near cost for the materials procured by it to perform the Maxim contract. The record further discloses that knowledge of the Italian government's disavowal of any liability under the Maxim contract was brought to his attention, and that hope or prospect of realizing contract prices for munitions under the Italian contract had been foreclosed. The contract between the plaintiff and the Maxim Munitions Corporation contained no cancellation clause applicable to the present contention, but the contract between the Maxim Munitions Corporation and the Italian Corporation, which

is the essential subject-matter from which source the plaintiff's income for the term involved was to accrue, did contain a stipulation as follows: "Ninth. Performance.—In the event that the seller shall fail to make deliveries within sixty (60) days after the date or dates upon which such deliveries are due according to the terms of this contract, by reason of fires, strikes, wrecks, explosions, confiscations, eminent domain, the acts of God or the public enemy or for any reason whatsoever, the buyer shall have the right to cancel this contract." Under this clause of the Italian contract the right of cancellation was exercised and liability to the contractor for losses occasioned thereby expressly disavowed by the Italian corporation.

Beyond doubt, default in deliveries obtained. What the plaintiff secured by its contract with the Maxim Munitions Corporation was the right to perform the latter's contract with the Italian corporation—the right, as expressly stated in the contract, "to manufacture cartridges upon the said contracts herein mentioned"— and the contracts identified by "herein mentioned" were the Italian contracts. The situation in which the plaintiff found itself in 1918 was not one where it was in process of performing a firm sales contract; the contract had been suspended, the plaintiff's performance had been effectually foreclosed, and no reason existed to expect that any of the articles contracted for would ever be delivered, the owner of the contract known to be insolvent and no hope of realizing the contract price for delivered articles obtained. If, therefore, the intent of the regulation is to predicate the ascertainment of income, in cases involving a firm sales contract, upon the fact that a valid contract exists whereby the contractor will in due course obtain the contract price, and that the inventory of materials on hand to perform the contract is by reason thereof worth more as a current asset than their market value, then, in so far as the Maxim contract with the plaintiff is concerned, the plaintiff is entitled to value its inventory at market value. It is true that in 1917 the sureties on the bond of the Maxim Munitions Corporation at the request of the corporation loaned the plaintiff $612,500 from the sum deposited with them, i. e., the advance payment made by the Italian government to the corporation which it deposited with the surety companies to go on its bond. This loan made under contracts for repayment, details of which we need not discuss, was in addition secured by the plaintiff's notes for the

amount loaned, guaranteed by the National Lead Company (finding 11). The plaintiff has not paid the notes, and suits are now pending against it for their payment and as yet undetermined. The plaintiff on its books of account carries as a liability upon the notes a sufficient reserve to liquidate a possible judgment against it because of this litigation. The defendant asserts that the plaintiff has this sum of money, that it is in excess of the $300,000 which the Maxim Munitions Corporation owes the plaintiff, and also in excess of the total of the former amount and the sum of $274,659.78 valuation put upon the plaintiff's inventory by the Commissioner in 1926, and that, in the event of the plaintiff's successful defense to the pending suits to recover the amount of the loan, the plaintiff will recover more than the contract value of the materials left on its hands by the cancellation of the Maxim contract with Italy. It is also true that the plaintiff purchased on March 16, 1926, for a consideration of $61,250, an unconditional conveyance from the trustees in bankruptcy of the Maxim Munitions Corporation, all the interest of said corporation in and all rights of action it might have against the Italian corporation, and attempts were made to realize from the Italian corporation the loss plaintiff suffered by reason of the cancellation of the Maxim Munitions Corporation contract.

From these facts the defendant argues that the plaintiff has a valid claim for reimbursement of the cost of its inventory. The plaintiff's only possible recourse against the Italian corporation must originate in the purchase of the interests of the Maxim Munitions Corporation against the Italian government. The record discloses that attempts to procure a settlement with the Italian corporation failed, and that the corporation is possessed of no assets in the United States and no known place of conducting business here, where service could be had upon it. In addition to the inferences which may be drawn from the facts as recited, the transactions cited are but remotely related to the issue of the valuation of inventories. Borrowed funds and assigned rights of action under a contract are not directly related to the valuation of inventories; they of course constitute a factor in the ascertainment of income, but their bearing upon the issue in suit is too remote and too conjectural to influence the question of what valuation should be placed under the law and regulations upon the unused and unworked materials allocated to

contract work after the contract has been canceled, especially so when the known facts discredit the possibility of realizing from the sources alleged, and a period of eight years having elapsed without any beneficial results. It is impossible now to indicate what may be the outcome of the litigation pending, and whatever it may be the taxing laws take care of it when it becomes a certainty. Lewellyn v. Electric Reduction Co., 275 U. S. 243, 48 S. Ct. 63, 72 L. Ed. 262.

United States Contracts.

The plaintiff entered into four contracts with the United States, represented by the War Department. One of the contracts provided for the manufacture and delivery of 135,100,000 .45-caliber cartridges, and the other three for the manufacture and delivery of 14,760,000 artillery primers. One of the contracts was made in 1917 and all the others on various dates in 1918 prior to November 11, 1918. In each of the contracts there was a provision for their cancellation in the event of the termination of the war, and likewise a provision for settlement of and payment to the plaintiff of amounts due it by reason of cancellation. As to materials on hand at time of cancellation the contracts provided as follows:

" * * * The United States shall also pay to the contractor the cost of the materials and component parts purchased by the contractor for the performance of this contract and then on hand in an amount not exceeding the requirements for the completion of this contract, provided they comply with the specifications, and also all costs shown by the contractor to have been theretofore necessarily incurred in the performance of this contract and remaining unpaid; and the United States shall also protect the contractor on all obligations incurred necessarily and solely for the performance of this contract of which the contractor can not be otherwise relieved. To the above may be added such sums as the Chief of Ordnance may deem necessary to fairly and justly compensate the contractor for work, labor, and service rendered under this contract.

"Title to all such materials and component parts paid for by the United States under this article shall, immediately upon such payment, vest in the United States. * * * ".

In December, 1918, following the armistice, the contracts were suspended and the plaintiff duly notified. The plaintiff observed the suspension notice and thereafter, in virtue of settlement contracts, following

a somewhat prolonged inspection and audit of plaintiff's accounts, a final settlement was concluded by the terms of which the plaintiff was paid the total sum of $1,154,618.35. Included in the sum so paid is an item of the cost of materials and finished and unfinished articles in plaintiff's plant allocated to the contracts involved, the conceded value of which was $732,088.62. In placing a valuation upon its inventory for the year 1918 the plaintiff claims it is entitled to fix the sum at the market value of the materials, etc., on hand to fulfill the contracts, i. e., the conceded market value of $231,615.43.

The Commissioner of Internal Revenue declined to accede to plaintiff's claim, and instead assessed, levied, and collected from plaintiff income, excess profits, and war profits taxes by valuing plaintiff's inventory for the year 1918 on the basis of the sum paid to it by the United States for materials allocated to the contracts, i. e., $732,088.62. Plaintiff's argument is addressed mostly to the same regulations and sections of the revenue laws that are involved in its contention with reference to inventory values in the preceding Italian contract. The facts as to the United States contracts present a decidedly different situation than was involved in the Italian contract. The United States contracts clearly disclose "firm sales contracts at fixed prices," and, while the contracts were subject to cancellation, they contained express covenants upon the part of the United States to save the plaintiff harmless in so far as the cost of materials, etc., entering into its inventory is concerned. The contracts contained express provisions setting forth with exactness how the plaintiff should be paid, and the items included within the Government's liability to pay. The regulations of the Commissioner, heretofore cited, article 1612 of regulations 65, wherein appears an option to value inventories at cost or market, whichever is lower, must, as we have previously said, be construed in the light of their purpose and in view of an actual and subsisting situation. There can be no doubt that, if the plaintiff's contention is correct, the value it seeks to place upon its inventory for the year 1918 does not represent the actual value received by it for the materials mentioned and does not clearly reflect its income for the year involved.

The Commissioner in determining the plaintiff's tax liability for 1918 had before him the actual situation with respect to plaintiff's status in relation to the United States contracts, and upon the basis of the same determined the tax. The plaintiff does not challenge the correctness of the amounts or dispute the receipt of the sums involved, which necessarily leaves its contention upon the single insistence that the words of the regulations entitle it to recover. Inventories at the beginning and end of the year, as provided for in the regulations, are essential to ascertain income, and, if their valuation may be fixed upon a basis known to be contrary to the actual facts, the purpose of the same is in no sense accomplished. All through the regulations concerned with this subject-matter run numerous provisions designed to meet situations wherein inventories are to be used, which clearly reflect an intent to value the inventories so used upon a basis of fact, and assuredly such a basis may not be challenged as counter to good accounting practice. It is of course true that at the close of the year 1918 the plaintiff was unaware as to the precise sum it would receive in dollars and cents for the materials on hand, the ascertainment of the same was yet to be made, and the final result dependent upon accounting. It did, however, possess an enforceable demand for their cost in the form of a positive covenant to pay the same from a responsible party, and, having voluntarily waived its right to have its tax liability for the year 1918 determined within the period of the statute of limitations with respect thereto, thereby enabled the exact determination of the cost of its inventory free from any uncertainty. The fixed statutory period within which the Commissioner must determine a taxpayer's liability is a period which Congress extended to him to ascertain liability, and the ascertainment of the same is to be accomplished from the taxpayer's return.

■ We need not recite the details essential to be pursued. It is in this case sufficient to state that an audit of plaintiff's return was available to the Commissioner and actual facts developed from such an audit may not be ignored. Therefore, it seems evident to the court that, so long as the Commissioner was lawfully possessed of the right to determine plaintiff's tax liability for the year 1918, and unquestionably the subject-matter was within his jurisdiction when he did act, he had under the law and regulations the right to take into consideration the fiscal transactions of the plaintiff occurring in that year and the final consummation of the same, notwithstanding it required additional time to ascertain the facts all taking place within the statutory period.

The plaintiff kept its books upon an accrual basis, and when it made its tax returns neither it nor the Commissioner could determine with accuracy its tax liability for the year 1918. The time consumed by both parties was in an effort to fix its taxes for 1918 upon the basis of what the actual value of its inventory should be, and before the statute of limitations expired facts developed which did fix the value of the same in dollars and cents. In this respect the case is no different from the adopted procedure many times occurring with respect to all tax returns involving a similar situation, and to hold that the Commissioner was bound as to the valuation of the inventory given by the taxpayer in the return filed for 1918, when later facts clearly and indisputably show that for all the items involved the taxpayer received cost of the same, would require the court to negative a positive fact. Keeping in mind that action of the Commissioner challenged in this case relates exclusively to plaintiff's tax liability for 1918, and that the Commissioner was acting within the scope of his jurisdiction, we find nothing in the many regulations cited to warrant a contrary holding.

The claims, i. e., the rights conferred upon the plaintiff under the settlement contracts executed by the parties within the year 1918, brought about a situation which within the statutory period matured into an observance of the settlement contracts by the United States and the plaintiff received payment in accord therewith, and all this was part of and essential to the ascertainment of plaintiff's inventory value for the year 1918. An entirely different situation might have developed, a matter not within the purview of the issue in this case, if the settlements had not been accomplished within the statutory period, and payments for the inventory had been postponed to later years. But in such case it would have been the duty of the Commissioner to determine the inventory at the actual cost to the plaintiff. The plaintiff executed the settlement contracts, proceeded thereunder, and received without protest within the statutory period determining its tax liability for 1918 the cost value of its inventory for that year, and while the payment was not made in 1918 it was made to pay for the cost of materials, etc., included in plaintiff's inventory for 1918. In the case of Producers' Fuel Co., 1 B. T. A. 202, the Board of Tax Appeals determined a controversy involving the principle upon which we rely. The Producers' Fuel Company in December, 1920, deliberately breached a contract for the future delivery to it of coal and set up on its books for the year 1920 an estimated liability upon the contract breached. Thereafter in 1921 the company compromised with its contractors for the breach and paid the sum of $35,292.40 in cash. The reserve set up on its books as before noted totaled $37,500, and the company claimed as a deduction this estimated amount from its gross income for the year 1920. The Board of Tax Appeals decided adversely to the plaintiff's contention, and in so doing said: "While it appears that at the end of the year 1920 this taxpayer estimated its liability under the breached contracts with approximate accuracy and set the sum up on its books of account and then made its income and profits tax return in accordance with such books, we have now before us a review of that income and profits tax return and in making such review it is our duty to consider not only the facts known and recorded at the close of December, 1920, but also those same facts as modified by subsequent events. These subsequent events have developed the fact that the damages and losses sustained by the taxpayer on account of the breach of the Monongahela contract were settled for the sum of $5,500, and that the damages and losses sustained by the taxpayer on account of the breach of the Campbell contract were finally determined and settled for the sum of $29,742.40. With these facts before us, and for the purpose of determining the final net taxable income of the taxpayer for the year 1920, the amounts of damages and losses as finally determined must now be substituted for the estimate originally made, and in place of the deductions claimed by the taxpayer in his return and disallowed by the Commissioner the losses and damages as finally settled must be allowed as the deduction contemplated by the law." See, also, cases of McCreery et al., 4 B. T. A. 967, and Ewing Thomas Converting Co. v. McCaughn (C. C. A.) 43 F.(2d) 503.

### Claimed Deduction from Gross Income on Account of the Cost of Buildings Erected on Leased Ground.

Prior to 1914 the plaintiff's factory buildings were rented from the Wamesit Power Company, the business of the plaintiff being carried on at Lowell, Mass., in the rented buildings owned by the Wamesit Company at that place. In 1914, shortly after the World War began, the plaintiff received orders from European governments for ammunition, and, in view of orders in hand and additional ones anticipated, the plaintiff be-

gan the erection of buildings essential to its manufacturing needs on land of the Wamesit Power Company at Lowell and South Lowell, Mass. The buildings involved were erected under an agreement between the plaintiff and the Wamesit Power Company that the expense of their construction should be borne by the plaintiff and occupied free of rental by it for a term of ten years, at the expiration of which time they were to become the property of the Wamesit Power Company. Under this agreement, which contained other provisions not material here, the plaintiff erected the buildings involved at a conceded cost of $802,499.49. During the war plaintiff's factory necessities were great and the new buildings erected on the leased grounds were occupied to their capacity. After the close of the war and the suspension of its contracts for ammunition, its business receded to normal conditions, and of course not all of the extra floor space of the buildings involved was needed. The lease under which the buildings were erected did not by its terms expire until the close of 1924, and for the six years remaining, i. e., from 1918 to 1924, the plaintiff occupied the buildings, continuing the manufacture of commercial ammunition and adding to this activity the manufacture of radiators, radiator tubes, phonograph motors, paper boxes, and certain other articles. The plaintiff in its tax return for 1916 charged off as a deduction a very large part of the cost of these buildings and machinery. The Commissioner of Internal Revenue declined to allow the deduction in full, holding that the cost of the plant should be charged off over the ten-year period of the lease, and that only a proportionate part could be charged off each year. The plaintiff acquiesced in the Commissioner's ruling. Later, however, when the war terminated and in making its tax return for 1918, the plaintiff claimed as a deduction from its gross income the depreciated value of the buildings as of December 31, 1917, less their residual value, a total of $414,421.89, this sum being arrived at in the following manner, viz:

| | |
|---|---|
| Depreciation allowed by the Commissioner for the years 1914 to 1917, inclusive...... | $197,107.74 |
| Cost of buildings..$802,499.49 | |
| Less depreciation.. 197,107.74 | |
| Leaving a depreciated value as of 1918 of....... | 605,391.75 |
| From which a subtraction of residual value............. | 190,969.86 |
| Leaves ................. | 414,421.89 |

The Commissioner adhered to his former ruling, disallowed the claimed deductions, and instead allowed a depreciation deduction of $86,484.54, a proportionate annual allowance sufficient in amount to cover the cost of the buildings in the ten-year period of the lease.

The plaintiff's suit contests the ruling of the Commissioner and contends for the deduction claimed in its return for 1918. If the plaintiff's contention is sound, it is entitled to a substantial refund of taxes paid for the year 1918.

Section 234 (a) of the Revenue Act of 1918 (40 Stat. 1077), in so far as here pertinent, provides as follows:

"Sec. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions: * * *

"(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise; * * *

"(7) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence. * * *"

Article 143 of regulations 45 as to loss of useful value, is as follows: "Art. 143. Loss of useful value.—When through some change in business conditions the usefulness in the business of some or all of the capital assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in the business, he may claim as a loss for the year in which he takes such action the difference between the cost or the fair market value as of March 1, 1913, of any asset so discarded (less any depreciation sustained) and its salvage value remaining. This exception to the rule requiring a sale or other disposition of property in order to establish a loss requires proof of some unforeseen cause by reason of which the property must be prematurely discarded, as, for example, where an increase in the cost of or other change in the manufacture of any product makes it necessary to abandon such manufacture, to which special machinery is exclusively devoted, or where new legislation directly or indirectly makes the continued profitable use of the property impossible. This exception does not extend to a case where the useful life of property terminates solely as a result of those gradual processes for which depreciation allowances are authorized. It does not apply to inventories or to other than capital assets. The exception applies to buildings only when they are perma-

nently abandoned or permanently devoted to a radically different use, and to machinery only when its use as such is permanently abandoned. Any loss to be deductible under this exception must be charged off on the books and fully explained in returns of income. But see articles 181–189."

Article 109 of the same regulations, as to rentals, contains the following terms: "Art. 109. Rentals.—Where a leasehold is acquired for business purposes for a specified sum, the purchaser may take as a deduction in his return an aliquot part of such sum each year, based on the number of years the lease has to run. Taxes paid by a tenant to or for a landlord for business property are additional rent and constitute a deductible item to the tenant and taxable income to the landlord, the amount of the tax being deductible by the latter. The cost borne by a lessee in erecting buildings or making permanent improvements on ground of which he is lessee is held to be a capital investment and not deductible as a business expense. In order to return to such taxpayer his investment of capital, an annual deduction may be made from gross income of an amount equal to the total cost of such improvements divided by the number of years remaining of the term of lease, and such deduction shall be in lieu of a deduction for depreciation. If the remainder of the term of lease is greater than the probable life of the buildings erected, or of the improvement made, this deduction shall take the form of an allowance for depreciation. See article 48."

Additional applicable regulations are found in articles 161 and 162 of regulations 45, each of which we quote:

"Art. 161. Depreciation.—A reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business may be deducted from gross income. For convenience such an allowance will usually be referred to as depreciation, excluding from the term any idea of a mere reduction in market value not resulting from exhaustion, wear and tear, or obsolescence. The proper allowance for such depreciation of any property used in the trade or business is that amount which should be set aside for the taxable year in accordance with a consistent plan by which the aggregate of such amounts for the useful life of the property in the business will suffice, with the salvage value, at the end of such useful life to provide in place of the property its cost, or its value as of March 1, 1913, if acquired by the taxpayer before that date. See further articles 39 and 844.

"Art. 162. Depreciable property.—The necessity for a depreciation allowance arises from the fact that certain property used in the business gradually approaches a point where its usefulness is exhausted. The allowance should be confined to property of this nature. In the case of tangible property, it applies to that which is subject to wear and tear, to decay or decline from natural causes, to exhaustion, and to obsolescence due to the normal progress of the art, as where machinery or other property must be replaced by a new invention, or due to the property becoming inadequate to the growing needs of the business. * * * *".

█ The plaintiff asserts seven distinct reasons, predicated upon facts, relied upon to bring its contention within the revenue laws and the commissioner's regulations. The buildings, it is said, were constructed exclusively for war purposes, there existed no other use for them. The normal business of the plaintiff did not warrant their construction. They were erected on leased premises and their usefulness in any event limited to a ten-year period; they were used up to their capacity for war purposes until 1918. The plaintiff did not know and had no means of knowing when the war would terminate, and hence it was impossible until that date to charge off more than their proportionate cost, as was done. Subsequent to the armistice the plaintiff did not contemplate the manufacture of war munitions for which the buildings had been erected; it received no new orders for war ammunition and of course was not to receive any. Income from rental of the buildings was not available because of a lack of demand for their use; they had been so incorporated into the buildings previously rented from the landlord that they had to be used as a unit unless at great cost they be revamped, which from a financial point of view was not warranted, and finally that the plaintiff sought, by adding to its commercial products the manufacture of a distinct line of articles not theretofore manufactured by it, to obtain a profitable use of the buildings, but without success. In other words, six years in advance of the complete obsoleteness under its lease of the buildings the plaintiff is to be allowed a deduction for the cost of the same, upon the theory that they in 1918 became no longer useful for the precise purposes for which they were erected. It is true the plaintiff made the investment for the purpose of fulfilling war contracts for ammunition, and that the armistice precluded a continuance of their use for this precise purpose, but the physical structures remained upon the prem-

ises for at least the full term of its lease; they were used and occupied by the plaintiff during this period largely for the manufacture of ammunition for which use they were adapted; possession was not surrendered to the landlord or the buildings abandoned, and, while unfortunately the continued business enterprise of the plaintiff proved unprofitable, it continued to go forward in these buildings under the same conditions applicable, as shown by the record, to pre-war times. What the plaintiff apparently complains of is not an injustice inflicted upon it by the Commissioner in the amount of the annual or total sums allowed it as depreciation or obsolescence allowances, but that a radical change in business relations and a serious diminution of income in 1918 entitle it to deduct from its gross income for 1918 the total balance of allowances which would accrue annually, less residual value of its lease in the year 1918. Obviously when the war was on, business abnormal and profits correspondingly so, manufacturers built according to their needs, and in many instances at the close of the war were in possession of quarters more than adequate for normal conditions. If, however, as here, the buildings involved were upon leased premises continuously occupied by the tenant for the full term of the lease, they thereby possessed a fixed period of value and usefulness. It is difficult to accurately determine in advance of the expiration of the lease any other loss to the lessee than the annual depreciation or obsolescence of the lease on any other than the basis of a final return of the capital investment. "Obsolescence," as said by the Board of Tax Appeals in the case of Tennessee Fibre Co., 15 B. T. A. 133, "as used in the statute is the state or process of becoming obsolete and the provision allowing a deduction therefor is intended to care for losses of capital which take place over a longer period than the taxable year." We are not confronted by the record with the happening of some event which rendered the buildings obsolete prior to the expiration of the lease, where the allowance of annual depreciation proportionate to their cost is insufficient to return cost of the same, for the buildings were not abandoned nor unsuitable for plaintiff's continued activities. Plaintiff may not have had use for all the floor space within them as it did previously, but this is not attributable to the buildings, it is due wholly to a loss of income from business activities. The economic condition which affected plaintiff was almost wholly due to loss of volume of business and not its character.

No single factor of the situation rendered the buildings obsolete in 1918, nor at any time thereafter until the expiration of the lease. Depreciation allowances under these circumstances comply with the revenue laws and regulations. In the recent case of Atwater & Co., Inc., 22 B. T. A. ——, the opinion deals with an issue similar to the instant case. From the opinion we cite the following excerpts:

"The petitioner claims in the alternative that it is entitled to a deduction for the obsolescence of the discharging tower completed in February, 1919. This claim is made on the unique theory that obsolescence exists in a case 'where the property turned out to be more than adequate for the needs of the business and it is foreseen that its value to the taxpayer is less than the balance of the cost less ordinary depreciation resulting from wear and tear spread over the actual physical life of the property.' * * *

"In the case at bar the element of obsolescence was not shown to have been present. We assume that the usual allowances were made for depreciation, wear and tear. No new or more modern machinery was being invented or used to replace its equipment. Only the ordinary repairs were necessary to insure its continued use as a modern and up-to-date facility such as would conform to the petitioner's present and future needs. Though the additional tower may have given petitioner an excess capacity, this fact does not establish obsolescence. We are of the opinion that petitioner is entitled to no deduction on the ground of obsolescence."

The Board of Tax Appeals in the case of Marigold Garden Co. v. Commissioner, 6 B. T. A. 368, 370, in discussing the principle involved in this case, said: "Uselessness to a taxpayer does not determine a deductible loss any more when attributable to a statutory prohibition than when attributable to any other extraneous cause over which the owner has no control. A change in style or market, or an exhaustion of the supply of raw materials for manufacture may destroy the utility of equipment just as effectually as the intervention of the law, and the detriment to the owner may be just as great. It seems clear that property is not ipso facto lost to a taxpayer because it is no longer useful to him. Ownership and possession still exist, and in some cases value may not wholly disappear. Value and usefulness are not necessarily interdependent, even though they very commonly look to each other for support. The want of either does not make cer-

tain the absence of the other. It should be kept in mind that the considerations in ascertaining net income must always be expressed in money and that all the factors relied upon must be translated into terms of money. Use is only significant to the extent that it is susceptible of such expression. No one would urge that an income deduction may be claimed because a fixture or tool proves less useful than expected when the purchase was made. Until the investment is converted into terms of money by sale or other disposition or its worthlessness otherwise demonstrated, there is neither loss nor gain and income is neither greater nor less."

The case of the McCabe Lathe & Machinery Co., 9 B. T. A. 1137, 1143, decided in 1928, involved in part an issue similar to plaintiff's contention. In deciding the case the Board in its opinion said: "The mere fact that a building is used for a purpose different than that originally intended does not determine the building to be obsolete. The loss which will be sustained over the remainder of the lease, after allowing for exhaustion of the cost of the building, is deductible yearly and can not be anticipated upon the theory that obsolescence has taken place when, in fact, the building continues to be suitable for the purpose of its erection and all that has taken place is a reduction in its income-producing capacity. The determination of the Commissioner as to this issue is, therefore, sustained." See, also, Troy Mfg. Co. Case, 7 B. T. A. 119; National City Bank of Seattle v. United States, 64 Ct. Cl. 236; Id., 276 U. S. 620, 48 S. Ct. 301, 72 L. Ed. 735.

We think a decided difference obtains between this case and the case of Burnet v. Niagara Falls Brewing Co., decided by the Supreme Court February 24, 1931, 282 U. S. 648, 51 S. Ct. 262, 264, 75 L. Ed. ——. The present record presents, in our opinion, a case where the plaintiff occupies buildings upon leased premises, buildings which possess a useful life in excess of the life of the lease, but which, in so far as the plaintiff is concerned, become obsolete upon a date certain, and the Commissioner possessed of this information determines obsolescence upon a basis which in accord with facts returns to the plaintiff the cost of the same. It is in all respects similar to a case wherein a business enterprise enjoying prosperity finds enlarged quarters essential to meet its demands, and without knowledge as to any exact date when an intervening incident may curtail its income, such as bad times, termination of a war, drought, etc., income is materially reduced or disappears, and the enlarged quarters are no longer essential for the needs of the corporation during this period of distress. Under these circumstances what may happen to the buildings during the remaining period of the lease is problematical and is distinctly different from a case where legislation prohibits the future use of the buildings for the purposes erected, and for which purpose they were specially designed and constructed and not "readily adaptable to other uses." The Commissioner in the present case did not refuse an obsolescence allowance. On the contrary, as previously observed, the plaintiff obtains a return of its capital, investment; the only issue in the present case is as to the year in which the deduction of obsolescence of tangible property should be allowed. In the Niagara Case, supra, the Supreme Court said: "Clearly the statute contemplates that, where warranted by the facts, the taxpayer shall have the benefit of, and in making his return may deduct in each year, a reasonable allowance to cover obsolescence of the tangible property," a holding in response to a contention upon the part of the United States that the statute did not authorize obsolescence allowance of tangible property in the familiar and so-called prohibition cases, an issue foreign to the record in this case. What the plaintiff is asking here is an anticipation of obsoleteness without a record to support the contention.

Finding 56 discloses the facts with reference to the plaintiff's claim of loss of useful value for a garage erected upon leased premises. We think the facts as found and not disputed bring the claim within what we have said with reference to the factory buildings. The findings clearly show that the claim may not be sustained.

We think that under the Italian contract the plaintiff is entitled to recover and will enter judgment therefor when the amount of the same is determined. As to the remaining items of the case the court concludes that they are without merit, and no allowance will be made therefor. It is so ordered.

WHALEY, Judge, took no part in the decision of this case.