BURNET, COMMISSIONER OF INTERNAL REVENUE, *v.* NIAGARA FALLS BREWING COMPANY ET AL.

No. 61. Argued January 21, 1931.—Decided February 24, 1931.

*Mr. Claude R. Branch,* Special Assistant to the Attorney General, with whom *Solicitor General Thacher, Assistant Attorney General Youngquist* and *Messrs. Sewall Key, J. Louis Monarch* and *John MacC. Hudson,* Special Assistants to the Attorney General, and *Clarence M. Charest,* General Counsel, Bureau of Internal Revenue, were on the brief, for petitioner.

*Mr. Basil Robillard* for respondents.

MR. JUSTICE BUTLER delivered the opinion of the Court.

In making its tax returns for 1918 and 1919 the brewing company, because of approaching prohibtion, made deductions for obsolescence of its buildings, machinery and equipment. The Commissioner disallowed the deductions on the ground that after prohibition the taxpayer continued to use his property to make and sell near beer and other non-intoxicating beverages. The Board of Tax Appeals sustained the Commissioner. 13 B. T. A. 1040. The Circuit Court of Appeals reversed. 38 F. (2d) 217.

The pertinent words of the statute, Revenue Act of 1918, § 234 (a) (7) are: "A reasonable allowance for the

exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence."

The Government contends that this statute did not authorize a deduction for obsolescence of tangible property resulting from the imminence of prohibition. But in the *Gambrinus* case just decided we hold the contrary.

The Government also maintains that on the facts of this case no allowance for obsolescence should be made.

We take judicial notice of the following: Prior to the submission of the Eighteenth Amendment in 1917, more than 30 States had enacted prohibitory laws. A war measure, effective August 10, 1917, required the reduction of the alcoholic content of beer. The proposed amendment was ratified by 12 States in the first six months of 1918 and by three more before the expiration of that year; 21 States ratified in the early part of January, 1919, and in that month the Amendment became a part of the Constitution and took effect one year later, January 16, 1920.

There is no controversy as to facts found by the Board of Tax Appeals:

The brewing company from 1902 until October, 1919, was engaged in making and selling beer. Its sales from 1912 to 1917 inclusive ranged from 30,681 to 37,176 barrels per year. Due to war-time prohibition, its sales fell off in 1918 to 30,204 barrels, about 19 per cent. less than the sales of the preceding year, and in 1919 to 17,823 barrels, about 40 per cent. less than in 1918.

At the end of 1917 the depreciated cost, and actual value, of the company's land, buildings and equipment was $477,054.60. After deducting the allowances in 1918 and in 1919 for exhaustion, wear and tear of its plant and for obsolescence of property used for making beer, the book value of such property was reduced to $279,117.08.

But due to prohibition laws its actual value at the end of 1919 was only $90,475. That is $188,642.08 less than the book value after such deductions.

Its buildings, machinery and equipment were designed and constructed for the brewing and selling of beer and were not available or readily adaptable to other uses. The buildings were damp, the floor levels uneven; there were few openings for light and no elevators, and the property was located in a manufacturing zone. Much of the machinery could not be removed without dismantling or tearing out the walls of the building and some of it could not be removed except by tearing out a side of the building. The company's officers considered selling or converting its buildings and machinery into a plant for a dairy, cold storage, ice cream manufacturing, dry storage, ice manufacture, fruit storage, semicold storage, machine shop, or chemical plant. They could find no use for the property except for the purpose of making near beer and other soft drinks.

In 1917 the company began to manufacture near beer and for that purpose used the machinery and processes employed in the making of beer. An additional process for dealcoholizing was necessary. It sold 16 barrels in that year, 327 in 1918, 8 in 1919, 7,921 in 1920 and 2,852 in 1921.

In 1918 it began the manufacture of other soft drinks by use of machinery not here involved. In October, 1919, because of prohibition, the company discontinued the making of beer. It abandoned the lower floor of one of its buildings which had been devoted to storing and aging beer. That process is not involved in making near beer. Thereafter a part of another building with the equipment therein which had been used three or four times a week in making and bottling beer was used only once in about two weeks in making near beer. Apparently the rest of the property was used in connection with

the making of such near beer and other soft drinks as were made by the company prior to its going out of business.

The company could not operate at a profit after prohibition and the corporation was voluntarily dissolved in December of 1921. Its affairs were administered by its former directors acting as trustees. In January, 1922, they leased all the property, including equipment that had been added for the making of soft drinks, for a term of three months with privilege of renewal by the lessee. The lease was still in effect at the time of the hearing before the Board in 1927. The rent was at the rate of $5,000 per year plus taxes, insurance and repairs.

The difference between the depreciated cost (found to be actual value) December 31, 1917, and the value of the property in 1918 and 1919 was due to the imminence and incidence of war-time and permanent prohibition. There was no material change in the value of land and buildings in the vicinity used for purposes other than brewing. In December, 1921, the company sold certain of its land, free from buildings, for $20,000. Up to the time of the hearing the highest offer for the remaining property that the company was able to secure was $35,000.

The Government argues that obsolescence is the state of becoming obsolete, that property is obsolete when it is no longer useful for the purpose for which it was acquired and cannot be used for any other purpose and that obsolescence begins only when there is a reasonable certainty that the property will become obsolete. And further, that there is no finding that at any time during the taxable years in question it became apparent that the property would become obsolete and that no inference to that effect can properly be drawn from the facts found.

In the solution of the problem here presented, no general or comprehensive definition of " obsolescence " is necessary. The word is much used and its meaning de-

pends upon and varies with the connections in which it is employed. It has been said to be "the condition or process by which units gradually cease to be useful or profitable as a part of the property, on account of changed conditions." * Obsolescence is not necessarily confined to particular elements or parts of a plant; the whole may become obsolete. Obsolescence may arise as the result of laws regulating or forbidding the particular use of the property as well as from changes in the art, the shifting of business centers, loss of trade, inadequacy or other causes.

We are here concerned with the meaning of obsolescence as used in the above quoted clause of the taxing Act. Clearly the statute contemplates that, where warranted by the facts, the taxpayer shall have the benefit of, and in making his return may deduct in each year, a reasonable allowance to cover obsolescence of the tangible property. And that is in accord with sound principles of accounting. Cf. *Kansas City So. Ry.* v. *United States,* 231 U. S. 423, 451. *Pacific Gas Co.* v. *San Francisco,* 265 U. S. 403, 415. The provision is general and applied alike to all taxpayers; its purpose is to guide the ascertainment of taxable income in each year. It is a familiar rule that tax laws are to be liberally construed in favor of taxpayers. *Farmers Loan & T. Co.* v. *Minnesota,* 280 U. S. 204, 212. *Bowers* v. *N. Y. & Albany Co.,* 273 U. S. 346, 350. *United States* v. *Merriam,* 263 U. S. 179, 188. *Shwab* v. *Doyle,* 258 U. S. 529, 536. *Eidman* v. *Martinez,* 184 U. S. 578, 583.

It would be unreasonable and violate that canon of construction to put upon the taxpayer the burden of proving to a reasonable certainty the existence and amount of obsolescence. Such weight of evidence as would reasonably support a verdict for a plaintiff in an ordinary action for the recovery of money fairly may be deemed sufficient.

---

* Transactions, Am, Soc. C. E., Vol. 81, p. 1527.

Neither the cost of obsolescence nor of accruing exhaustion, wear and tear that is properly chargeable in any period of time can be measured accurately. A reasonable approximation of the amount that fairly may be included in the accounts of any year is all that is required. In determining the proper deduction for obsolescence there is to be taken into consideration the amount probably recoverable, at the end of its service, by putting the property to another use or by selling it as scrap or otherwise. There is no hard and fast rule, as suggested by the Government, that a taxpayer must show that his property will be scrapped or cease to be used or useful for any purpose, before any allowance may be made for obsolescence.

There is no claim that, if allowable at all, the amounts deducted were excessive or that they were not properly allocated as between the two years in question. The rapid advance toward prohibition prior to and in 1917 was sufficient to warn one engaged in brewing beer that his business would probably be brought to an end at an early date. In January, 1919, before the tax return for 1918 was due, prohibition was established to take effect one year later. The facts found show that in the early part of 1918 the company was abundantly justified in concluding that upon the taking effect of prohibition it must cease to use its brewery for making beer.

It was then warranted in concluding that the period of obsolescence commenced about the first of 1918 and would end upon the taking effect of prohibition. The fact that prohibition would put all the breweries out of business is enough to show that it would be practically impossible to sell such properties or find other uses to which they profitably could be put. Due to prohibition the diminution in value of the company's property in 1918 and 1919 was about twice as much as the total of all sums deducted to cover obsolescence in those years. In that period over 80

per cent. of the 1917 value of its lands, buildings and equipment disappeared. Notwithstanding diligent efforts, the property could not be put to any profitable use or sold for more than a fraction of its value in 1917. The rents realized under a short term lease renewed from time to time for more than five years amounted to less than one and one-half per cent. of such value.

The facts found clearly show that obsolescence commenced about the beginning of 1918 and that the property became obsolete upon the taking effect of prohibition in January, 1920. The company was unable to find any profitable use to which the property could be put. The sums received on the sale and as rents constituted mere salvage.

*Judgment affirmed.*