**UNITED STATES v. WAGNER ELECTRIC MFG. CO.**

**No. 9452.**

Circuit Court of Appeals, Eighth Circuit.

Sept. 26, 1932.

T. H. Lewis, Jr., Sp. Atty., Bureau of Internal Revenue, of Washington, D. C. (Louis H. Breuer, U. S. Atty., of Rolla, Mo., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., on the brief), for the United States.

R. W. Chubb, of St. Louis, Mo. (Lewis, Rice, Tucker, Allen & Chubb, of St. Louis, Mo., on the brief), for appellee.

Before GARDNER and SANBORN, Circuit Judges, and NORDBYE, District Judge.

SANBORN, Circuit Judge.

The appellee, who will be hereinafter referred to as the taxpayer, brought suit against the United States to recover income and profits taxes for the calendar year 1918, which taxes were alleged to have been erroneously assessed and collected. The case was tried by the court without a jury, and resulted in a judgment for the taxpayer. The government has appealed.

There is no dispute as to the facts. The taxpayer, prior to the year 1916, was engaged exclusively in the business of manufacturing electrical apparatus. In 1916 it entered into a contract with the British government to make eight-inch shells, and manufactured

such shells until April, 1917, at which time it entered into an agreement with the United States to manufacture eight-inch shells of a different design. It proceeded under this agreement until December 12, 1918, at which time it received from the proper officer of the United States a request to suspend immediately further operations under the contract, except such as might be necessary to complete material then in process in the plant, but in no case to continue work beyond January 31, 1919. The taxpayer complied with this request, and on December 12, 1918, suspended all operations of shell making except heat treatment and operations subsequent thereto necessary to finish shells which had been theretofore manufactured up to the stage of heat treatment. On January 31, 1919, it terminated its business of shell making. The loss to the taxpayer due to obsolescence of plant and machinery which were specially adapted for shell making was the sum of $175,866.49.

The taxpayer claimed the right, under the provisions of section 234 (a) (7) of the Revenue Act of 1918, 40 Stat. 1077, 1078—which provided for "a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence"—to deduct the entire loss from its net income for the taxable year ended December 31, 1918. The commissioner took the position that this loss did not occur during the year 1918, and refused to allow any deduction for obsolescence during that year. The taxpayer made claim for refund, which was denied, and this suit followed.

The only question presented is: How much, if any, of the admitted loss of $175,-866.49 should be attributed to the year 1918?

The court below reached the conclusion that $119,000 of this loss should be allocated to the year 1918, and $56,866.49 to the year 1919, and gave judgment accordingly.

This allocation was based upon the relative value of machinery and equipment which were no longer used in any of the operations of shell making by the taxpayer in 1918, and the value of the machinery and equipment which were used up to January 31, 1919, in completing the shells in process. The finding of the court is: "Plaintiff did not use after December 12, 1918, 36 machines using 662.5 horse power, which were purchased prior to April 6, 1917, and 10 machines using 85 horsepower, also a hydraulic press operated by an accumulator, using a 50 horsepower motor, which were purchased after April 6,

1917. That the plaintiff continued to use until January 31, 1919, 21 machines, using 135 horsepower, which were purchased prior to April 6, 1917, and 23 machines using 162.5 horsepower, together with an appliance for hydraulic tests, a disc oven, an air tank and blast, and a conveyor (the horsepower of these latter not being shown by the evidence) purchased after April 6, 1917. That the relative value of the machinery (including that purchased after April 6, 1917) used in the first 8 operations (i. e., operations prior to heat-treatment) was $119,000; and that the value, or relative value of those used in the heat-treatment and in operations subsequent thereto, was the sum of $33,200, that the value of the buildings and their appurtenances, less depreciation and salvage, was the sum of $23,866.49; that the total relative values of machines (appurtenances) to shell-making was therefore, as $119,000 is to $56,866.49, and that said shell-making appliances of the relative value of $119,000 were not used after December 19, 1918, but that appliances and buildings of the relative value of $56,866.48 were used in 1919, and until January 31, 1919."

At the time of the trial of this case, it was apparently the contention of the government that, since none of the machines or equipment used in shell making was removed from the plant or dismantled until late in 1919, and since the plant was fully adapted to the manufacture of eight-inch shells, there was no obsolescence of plant or machinery which could be attributed to the year 1918. At that time the case of United States Cartridge Co. v. United States, 284 U. S. 511, 52 S. Ct. 243, 76 L. Ed. 431, had not been decided. That case related to a munitions manufacturer which in 1914 commenced making ammunition for war use, and constructed new buildings upon leased land. The court said (page 513 of 284 U. S., 52 S. Ct. 243, 244):

"Petitioner, for some years before the war, had been a manufacturer of ammunition for small arms used in times of peace. It carried on at Lowell, Massachusetts, principally in buildings rented from a power company. During the years 1911 to 1914, inclusive, its business was relatively small and not profitable. In 1914 it commenced making ammunition for use in the war and, for the purpose of continuing that business while the war should last, it constructed new buildings upon the power company's land at a cost of $802,-499.49 pursuant to an agreement that it should have the right to use them rent free until December 31, 1924, and then hand them

over to the power company. Until the armistice, at first for foreign governments and later for our own, it had orders, and used all the buildings, up to their capacity in the manufacture of war ammunition. There was no way of knowing when this demand would cease."

"Petitioner did not expect to make military ammunition after conflict ended and in fact received no orders after the armistice. It continued the commercial ammunition business but made no profit in any year from 1918 to the end of the lease. The buildings could not be rented. Those belonging to the power company had been incorporated into the new ones. The space so made was much greater than required for its commercial ammunition business. Petitioner, for the purpose of utilizing the excess, undertook the manufacture of some other things, but that business was small and resulted in loss each year. There was a garage used during the war production but not needed afterwards. Petitioner attempted to operate the building as a public garage but, realizing no net return, rented it to others from October, 1923, until the end of the lease.

"The Commissioner allowed deductions on account of the cost of the buildings for the years from 1914 to 1917, inclusive, amounting in all to $197,107.74, leaving as of the end of 1917, cost less depreciation $605,391.75. In the settlement of its 1918 taxes petitioner claimed that, as of the end of that year, the value of its right to use the new buildings during the remainder of the term was $190,969.86, and the Court of Claims found it not in excess of that amount. Petitioner claimed a deduction of the difference between the depreciated cost and such residual value. The Commissioner disallowed the claim on the ground that it had not abandoned the use of the buildings or permanently devoted them to a radically different use. He allowed $86,484.54, arrived at by distributing the cost of each building ratably over the period ending with the term of the lease. The difference between the deduction claimed and that allowed is $327,937.35. In its tax returns for the remaining years of the lease, petitioner claimed deductions on account of the buildings amounting in all to $190,969.86, but the Commissioner added to such deductions $327,937.35."

The court pointed out that "'obsolescence' may arise from changes in the art, shifting of business centers, loss of trade, inadequacy, supersession, prohibitory laws, and other things which, apart from physical deterioration, operate to cause plant elements or the plant as a whole to suffer diminution in value," and then said (page 517 of 284 U. S., 52 S. Ct. 243, 245): "Under the circumstances disclosed by the findings, the buildings erected by petitioner are not to be distinguished from equipment designed, constructed and suitable only for the performance of a single job or from brewery plants put out of use by prohibitory laws. The Government does not suggest that any part of the allowance claimed should have been deducted in petitioner's returns for years prior to 1918. It was impossible to know when the conflict would cease but it was certain that, when demand for war materials ended, there necessarily would be great diminution in the value of the buildings. That remaining after the armistice, November 11, 1918, was properly to be regarded as in the nature of salvage. The depreciated cost less the value of petitioner's right to use the buildings after 1918 must be taken into account for the proper determination of petitioner's 1918 income and profits taxes. Gambrinus Brewery Co. v. Anderson, supra [282 U. S. 638, 51 S. Ct. 260, 75 L. Ed. 588]; Burnet v. Niagara Brewing Co., supra [282 U. S. 648, 51 S. Ct. 262, 75 L. Ed. 594]." The court held that the lower court's dismissal of the petitioner's claims for deduction on account of buildings and inventories could not be sustained.

■ The government here contends that the method used by the lower court in determining the amount of obsolescence attributable to the year 1918 was improper; that it did not have before it evidence of the value of the use of the plant and machinery subsequent to the armistice and subsequent to 1918 and had no proper basis upon which it could determine the question presented.

The end of the war on November 11, 1918, marked the end of the usefulness of special plants and machinery for the making of munitions to be used in the prosecution of the war. The value of such plants and machinery due to the continuation of hostilities disappeared when the hostilities ceased, and there remained then only such value as the property might have for other uses or for salvage. As the loss from obsolescence to this taxpayer was admitted, there remained to be determined only the question as to what proportion of such loss could properly be attributed to the year 1918. Since the event which caused the loss occurred in 1918, it would appear that the entire loss might not unreasonably have been attributed to that year. The fact that the taxpayer could still

use a portion of the machinery for one month in 1919 to finish shells in process of manufacture was a matter to be considered in determining its income for 1918, but obviously it did not postpone the effect of the Armistice upon the value of the taxpayer's tangible property or prevent the depreciation of that property resulting from that event. Being valuable only in time of war, the property took the full depreciation due to the cessation of war at once. We think that in this case it is not important what value the taxpayer's property had for use in finishing work in process, since the full amount of loss due to obsolescence is not in dispute and since the use was merely incidental to the winding up of the taxpayer's business of manufacturing munitions. The Board of Tax Appeals apparently reached a similar conclusion in Plymouth Brewing & Malting Co. v. Commissioner, 16 B. T. A. 123, and in J. Chr. G. Hupfel Co., Inc., v. Commissioner, 9 B. T. A. 944.

In Burnet v. Niagara Falls Brewing Co., 282 U. S. 648, 654, 51 S. Ct. 262, 265, 75 L. Ed. 594, the Supreme Court said:

"It is a familiar rule that tax laws are to be liberally construed in favor of taxpayers. Farmers Loan & T. Co. v. Minnesota, 280 U. S. 204, 212, 50 S. Ct. 98, 74 L. Ed. 371, 65 A. L. R. 1000; Bowers v. N. Y. & Albany Co., 273 U. S. 346, 350, 47 S. Ct. 389, 71 L. Ed. 676; United States v. Merriam, 263 U. S. 179, 188, 44 S. Ct. 69, 68 L. Ed. 240, 29 A. L. R. 1547; Shwab v. Doyle, 258 U. S. 529, 536, 42 S. Ct. 391, 66 L. Ed. 747, 26 A. L. R. 1454; Eidman v. Martinez, 184 U. S. 578, 583, 22 S. Ct. 515, 46 L. Ed. 697.

"It would be unreasonable and violate that canon of construction to put upon the taxpayer the burden of proving to a reasonable certainty the existence and amount of obsolescence. Such weight of evidence as would reasonably support a verdict for a plaintiff in an ordinary action for the recovery of money fairly may be deemed sufficient. Neither the cost of obsolescence nor of accruing exhaustion, wear, and tear that is properly chargeable in any period of time can be measured accurately. A reasonable approximation of the amount that fairly may be included in the accounts of any year is all that is required. In determining the proper deduction for obsolescence, there is to be taken into consideration the amount probably recoverable, at the end of its service, by putting the property to another use or by selling it as scrap or otherwise. There is no hard and fast rule, as suggested by the government, that a taxpayer must show that his property will be scrapped or cease to be used or useful for any purpose, before any allowance may be made for obsolescence."

All that the court, in this case, was required to do, then, was to make a reasonable approximation of the portion of the admitted loss from obsolescence which took place in the year 1918, when the event transpired which caused the entire loss.

Our conclusion is that the method adopted by the court as the basis of the apportionment of the loss was entirely fair and equitable, and that the result is one of which the government cannot complain.

The judgment is affirmed.