## NEWPORT CO. v. UNITED STATES.
### Civ. No. 2506.

District Court, E. D. Wisconsin.
July 24, 1940.

Edmund B. Shea and Ralph Hoyt, both of Milwaukee, Wis., for plaintiff.

B. J. Husting, U. S. Dist. Atty., of Milwaukee, Wis., and M. S. Zimmerman and

J. W. Hussey, Sp. Assts. to Atty. Gen., for the Government.

DUFFY, District Judge.

The plaintiff is a Delaware corporation, organized in July, 1919, to engage in the manufacture and production of dye stuffs and other chemicals. In the same year it acquired all of the capital stock of the Newport Hydro Carbon Company, a Maine corporation; it thereafter consolidated with that company so that all of the assets of the Newport Hydro Carbon Company were conveyed to the plaintiff. The Hydro Carbon Company was dissolved. By reason of the transfer of the assets, the plaintiff became the owner of the claims for refund of taxes which are the basis of this action, which is brought under Sec. 24(20) of the Judicial Code, as amended by the Act of February 24, 1925, C. 309, 43 Stat. 972, 28 U.S.C.A. § 41(20).

In December, 1915, Newport Hydro Carbon Company, which for convenience will be called the Hydro Carbon Company, was organized under the laws of Maine, to produce synthetic phenol for sale primarily to the French government. Phenol was an ingredient of high explosives and the demand for it was greatly increased by the European war which began in 1914. A plant was erected at Carrollville, Wisconsin, especially designed and equipped for the manufacture of phenol, and as thus constructed was not adapted for any other purpose. The plant at first had a capacity of 4 tons per day, but extensions were added from time to time so that at the time of the Armistice, it was producing 45 tons per day. After the entrance of this country into the war, most of the phenol was produced for our government. The Hydro Carbon Company was not engaged in any other business besides the production of phenol.

With the cessation of the war, large stocks of phenol accumulated, as the peacetime demand for the product was comparatively small. Furthermore, the process used by the plant, while satisfactory for wartime emergency, was not suitable for peacetime production. It was not practicable to utilize the plant for other purposes without expensive alterations. It was, therefore, determined by the officers and stockholders to cease operation, to dismantle the plant, and to go out of business. Manufacturing operations ceased on December 3, 1918; employees were discharged; and the process of dismantling the plant was commenced. By the end of the year 1918, the plant had been closed and it was not the intention of the owners to resume its operation for the production of phenol, or for any other purpose.

A portion of the plant, buildings, machinery and equipment had been erected and installed prior to April 6, 1917, the date when the United States engaged in the World War. As of December 31, 1938, the fair value of the plant was $125,000, of which $42,510.36 represented that portion of the plant, buildings, machinery and equipment erected and installed prior to April 6, 1917.

The plaintiff, from the time of its organization until 1931, carried on operations in buildings acquired from the Hydro Carbon Company and also in other buildings adjacent thereto. Some use was made of buildings which formerly comprised part of the phenol plant; however, by reason of their design and insufficient height, they were not well suited for plaintiff's purposes. Approximately 15% of the machinery and equipment acquired from the Hydro Carbon Company was used by the plaintiff.

In April, 1918, the Hydro Carbon Company paid taxes to the United States government amounting to $50,912.75, based on its income for the year 1917. In its return, large sums were deducted for depreciation on its buildings and equipment. In June of 1919 the company filed its income and profits tax return for the year 1918, and paid taxes amounting to $491,486.72.

In April of 1920, the plaintiff, as successor to the Hydro Carbon Company, filed a claim for refund of 1918 taxes in the amount of $19,920.54. On or about February 9, 1923, the plaintiff as such successor filed another claim for refund in the sum of $455,365.23. On March 8, 1923, the Bureau of Internal Revenue assessed an additional tax of $317,332.90 against the Hydro Carbon Company for the year 1917. This was largely brought about by disallowance of claims for depreciation. On March 23, 1923, the plaintiff filed a claim for credit of 1918 taxes in the amount of $317,612.80, to offset the 1917 additional assessment, and also filed a claim for refund of $137,752.42. Subsequently the Bureau of Internal Revenue determined an over-payment for the year 1918 in the amount of $372,785.56. Of this amount the Commissioner, on March

9, 1928, credited against the 1917 additional assessment, the sum of $317,232.90, and refunded $35,632.12, plus interest.

Under date of December 9, 1922, the plaintiff executed an unlimited waiver of the time within which assessment might be entered for the year 1917. By a general notice, published by the Commissioner of Internal Revenue, all such waivers were terminated as of April 1, 1924. No proceedings for the collection of the 1917 additional assessment of March 8, 1923, were commenced within the period of limitation so extended.

The contention of plaintiff can be divided into two parts: First, it is claimed that the Commissioner's calculation of the tax is excessive, because of his failure to give effect to a deduction of the $74,048.-47 for obsolescence and loss of useful value of capital assets; also in not allowing an additional item of $7,749.84 representing the amount paid out incidental to the original organization of the corporation; and second, it is contended that the Commissioner had no authority in the year 1928 to apply moneys of the plaintiff in payment of the taxes for the year 1917, because collection of taxes for that year were at that time barred by the Statute of Limitations. The defendant denies that the claim for obsolescence or loss of useful value of capital assets is proper, and sets up an affirmative defense of equitable estoppel, contending that the plaintiff made certain representations which misled the Commissioner and induced him to refrain from collecting the additional 1917 tax.

This action was commenced in 1929. A second amended complaint was served on December 7, 1937, and the trial was commenced before my predecessor on that date. Most of the facts are not in dispute, and are contained in three written stipulations. In addition there are 208 pages of testimony. The case was taken under advisement, but was not decided at the time that Judge Geiger resigned from the bench on May 21, 1939. The matter was brought on for trial before me upon the same stipulations of fact, with accompanying exhibits and the transcript of testimony which had been taken before Judge Geiger at the previous trial. The matter was held open to give the defendant an opportunity to introduce testimony if it so desired; but the government has since determined that no further testimony would be introduced on its behalf.

The first question to be considered is the claim for obsolescence or loss of useful value. There is no question but that the cessation of hostilities greatly reduced the value of the phenol plant. The activities of the Hydro Carbon Company were essentially a war enterprise. The Commissioner of Internal Revenue allowed a deductible loss approximating $581,000 sustained in the year 1918 upon that portion of the plant which was erected after this country entered the war. The claim is made here that a like deduction should be recognized and allowed for the year 1918 upon that portion of the phenol plant which was erected prior to April 6, 1917. The amount of loss sustained on that portion of the plant erected before April 6, 1917, may be calculated in accordance with the formula provided by the statute for calculating amortization. The cost of the pre-war plant has been stipulated at $387,579.48. The depreciation has likewise been stipulated at $271,020.65. The salvage value of the entire plant being $125,000 less the real estate valued at $660, and 65.81% being attributable to the amortizable portion of the plant, there remains $42,510.36 representing the value of the pre-war portion of the plant. The amount of the loss thus computed is $74,-048.47.

In order to compute amortizable loss under the statute, it was of course necessary to draw a line between the plant investment which was made before April 6, 1917, and the plant investment made thereafter. However, the sudden change in conditions affected the so-called prewar plant in exactly the same manner as the balance of the establishment.

Under the rule laid down in the cases hereafter cited, this loss would appear to fall within the definition of Loss of Useful Value under Sec. 234(a) (4) of the Revenue Act of 1918, 40 Stat. 1078, and also Art. 143 of the Treasury Department Regulation 45; and also under the heading of Obsolescence, Sec. 234(a) (7).

The government contends that any shrinkage of value in the phenol plant caused by the sudden ending of the war is not deductible both under Sec. 234(a) (7) of the Revenue Act of 1918 relating to Obsolescence and Sec. 234(a) (4) re-

lating to Loss of Useful Value. A motion was made by the defendant to require the plaintiff to elect as between these two grounds of relief, but this court denied the motion. One of the most recent cases where reliance was placed on both sections is the case of Anheuser Busch, Inc., v. Becker, Collector of Internal Revenue,[1] a Missouri case dated March 7, 1940.

Art. 143 of the Regulations above referred to provides in part: "Loss of Useful Value: When through some change in business conditions the usefulness in the business of some or all of the capital assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in the business, he may claim as a loss for the year in which he takes such action the difference between the cost or the fair market value as of March 1, 1913, of any asset so discarded (less any depreciation sustained) and its salvage value remaining. * * * The exception applies to buildings only when they are permanently abandoned or permanently devoted to a radically different use, and to machinery only when its use as such is permanently abandoned. * * *"

The defendant contends that a loss, to be deductible, must be total and complete, but the wording of Art. 143, where it refers to "salvage value remaining," shows that it applies to losses which are not total losses. In this case the taxpayer did discontinue the use of the buildings, did cease doing business, and did liquidate. The plaintiff's use of the buildings must be held to be radically different from that of the Hydro Carbon Company. Likewise the contention of the defendant that the end of the war was a foreseeable event would seem to be unsound. While everyone assumed the war would end sometime, yet the exact time, for which plans might be made, was very uncertain and impossible to determine. A case very much in point is United States Cartridge Co. v. United States, 284 U.S. 511, 517, 52 S.Ct. 243, 245, 76 L.Ed. 431. The opinion states: "The Government does not suggest that any part of the allowance claimed should have been deducted in petitioner's returns for years prior to 1918. It was impossible to know when the conflict would cease but it was certain that, when demand for war materials

ended, there necessarily would be great diminution in the value of the buildings. That remaining after the armistice, November 11, 1918, was properly to be regarded as in the nature of salvage. The depreciated cost less the value of petitioner's right to use the buildings after 1918 must be taken into account for the proper determination of petitioner's 1918 income and profits taxes."

Another case which supports the plaintiff's right to deduct the loss under Sec. 234(a) (4) is Dean v. Hoffheimer Bros. Co., 6 Cir., 29 F.2d 668. In that case, because of the effects of the Eighteenth Amendment, the company decided in 1918 to discontinue its business as a distillery. The difference between the then value of the plant and the depreciated cost was entered as a loss and claimed as a deduction on the taxpayer's income tax return for the fiscal year ending June 30, 1918. The court said (29 F.2d at page 669): "It was therefore certain on May 2, 1918, as the lower court found, that. appellee's property could never again be used for distillery purposes. The court also rightly found that the property was not adaptable to other uses, and that appellee sustained a greater loss in its useful value during the taxing year than it charged on its books."

While under ordinary circumstances it might be considered that Sec. 234(a) (4) covering Loss of Useful Value and Sec. 234(a) (7) covering Depreciation and Obsolescence might be mutually exclusive, yet under conditions which the Hydro Carbon Company faced as a result of the sudden ending of the war, it appears that the plaintiff is correct in claiming loss under either section.

A leading case on the question of obsolescence under similar conditions is United States v. Wagner Electric Mfg. Co., 8 Cir., 61 F.2d 204. The defendant company had been engaged in the manufacture of shells for the British government and later for the United States government. On December 12, 1918, the company ceased operating, except for some comparatively minor operations in the first part of 1919 which was necessary to finish the shells which were then in process of manufacture. The Commissioner of Internal Revenue, while conceding the amount claimed as a deduction,

---

[1] No opinion for publication.

contended that the loss did not occur during the year 1918. The government contended that the plant was not dismantled until 1919. The court referred to the case of United States Cartridge Co. v. United States, supra, and among other things stated (61 F.2d at page 206): "The end of the war on November 11, 1918, marked the end of the usefulness of special plants and machinery for the making of munitions to be used in the prosecution of the war. The value of such plants and machinery due to the continuation of hostilities disappeared when the hostilities ceased, and there remained then only such value as the property might have for other uses or for salvage. As the loss from obsolescence to this taxpayer was admitted, there remained to be determined only the question as to what proportion of such loss could properly be attributed to the year 1918. Since the event which caused the loss occurred in 1918, it would appear that the entire loss might not unreasonably have been attributed to that year."

With reference to the government's claim that there should be no deduction for obsolescence at all, because the plaintiff has failed to show a definite amount of loss, it is my opinion that this case comes within the rule laid down in Burnet v. Niagara Falls Brewing Co., 282 U.S. 648, 51 S.Ct. 262, 75 L.Ed. 594, where the court said (282 U.S. at page 655, 51 S.Ct. at page 265, 75 L.Ed. 594): "Neither the cost of obsolescence nor of accruing exhaustion, wear, and tear that is properly chargeable in any period of time can be measured accurately. A reasonable approximation of the amount that fairly may be included in the accounts of any year is all that is required. * * * There is no hard and fast rule, as suggested by the government, that a taxpayer must show that his property will be scrapped or cease to be used or useful for any purpose, before any allowance may be made for obsolescence."

As the plaintiff is entitled to deduct the loss of $74,048.47, which was disallowed by the Commissioner, the parties hereto have agreed on the computation which fixes the refund at $61,015.95, plus interest.

The second portion of plaintiff's first contention concerns the claimed loss of $7,749.84, which was the amount of the organization expense of the Hydro Carbon Company. The corporation was dissolved in 1919. If this sum is properly deductible as a loss, it would not be for the year 1918, and the claim must be disallowed.

The second contention of the plaintiff, on the illegal credit issue, is based on the action of the Commissioner of Internal Revenue, in crediting an over-assessment in favor of the plaintiff for the year 1918 in the amount of $317,232.90 to a deficiency determined for the year 1917. At the time when such credit was given in March, 1928, the Statute of Limitations had run, unless the plaintiff by its conduct is estopped to challenge such application by the Commissioner.

In 1922 the Bureau of Internal Revenue advised the Hydro Carbon Company's tax representative and counsel that the large sums claimed for depreciation for the calendar year 1917 would be denied, but that the provisions of the 1918 Revenue Act in respect of amortization of war facilities, applied to the Hydro Carbon Company's plant, would result in a comparable allowance for amortization for 1918. The Bureau of Internal Revenue in Washington was contacted by plaintiff's representative who requested that the collection of the additional taxes for 1917 be postponed pending the determination of the amount of over-payment on the 1918 taxes. The company filed a waiver of the Statute of Limitations for 1917 and also filed a credit claim requesting that the over-payment, when finally determined for 1918, be used as far as necessary to satisfy the deficiency for 1917. The additional assessment for 1917 was made in May of 1923. The Collector of Internal Revenue at Milwaukee was directed to withhold any action toward the collection thereof, and no demand for payment was made upon the plaintiff.

The determination of the amount of over-payment was finally made on March 9, 1928, and on March 21, 1928, the credit was applied against the deficiency for 1917, as the plaintiff had consistently requested. The determination of the correct amount of the over-payment necessitated repeated audits, valuation studies, conferences, and much correspondence, all of which consumed considerable time.

The balance of the over-payment was refunded to the plaintiff in June of 1928, and was accepted without any protest. This sum amounted to $55,246.78, includ-

ing interest. At the time that the sum of $317,232.90 of the over-assessment was applied on March 21, 1928, as a credit against the balance of the additional assessment for the year 1917 remaining unpaid, there was no other assessment of federal taxes against the Hydro Carbon Company except the additional assessment for 1917. On December 12, 1929, the plaintiff made a demand in writing on the Commissioner for a refund to it in the sum of $317,232.90, which had been credited to the additional 1917 taxes.

We, therefore, have this situation: The tax of $317,232.90 had been assessed. Under ordinary procedure prompt steps would have been taken to collect same. However, at the request of the Hydro Carbon Company, no efforts were made at collection pending the determination of the amount of over-assessment for the year 1918. The plaintiff by its correspondence, by the requests made in conferences, and by the claim for credit itself repeatedly requested delay in the collection of the 1917 additional assessment in order that the 1918 over-payment, when it would be finally determined, might be utilized to satisfy it. No time limit was placed on the credit. It was natural that the plaintiff would endeavor to postpone any attempt at collection of the 1917 additional assessment in view of the fact that it was quite certain that the amount of the over-assessment for 1918 would equal or exceed the amount due on the 1917 tax.

The 1917 tax was due. The plaintiff was financially responsible. The tax could have been collected, but the government withheld action at the specific request of the plaintiff. The plaintiff is now estopped and should not be permitted to raise the defense of the Statute of Limitations. The leading case on this point is R. H. Stearns Co. v. United States, 291 U.S. 54, 54 S.Ct. 325, 78 L.Ed. 647. The facts in that case are in many respects similar to those in the case at bar. There the taxpayer had paid taxes for 1917 and 1918. The Commissioner proceeded to audit the returns to the end that the assessments might be increased or reduced according to the facts. In February, 1921, the taxpayer signed and filed a waiver of the Statute of Limitations as to the as-

sessment and collection of the 1917 tax. There, as here, this was done in order to be assured that the audit by the Commissioner would be deliberate and thorough. In 1923 the taxpayer filed a claim for refund and credit of taxes alleged to have been overpaid for 1918 and subsequent years, and asked that the unpaid balance for 1917 be set off against the claim for over-payment, and that the remainder be refunded. On March 1, 1924, the Commissioner approved a schedule of over-assessments which included an over-assessment for the year ending July 31, 1918. On June 28, 1924, the Commissioner filed the schedule of refunds and credits. Before doing this he had transmitted to the taxpayer a certificate of over-assessment for the fiscal year ending July 31, 1918. This over-assessment applied as a credit on the unpaid taxes for 1917. The claim was there made that at the time of the credit, the Statute of Limitations barred collection of the 1917 tax because of a defect in the waiver. The court in an opinion by Justice Cardozo stated the plaintiff's request, as follows, (291 U.S. at page 60, 54 S.Ct. at page 327, 78 L.Ed. 647): "In substance the request was this: Please do not collect the tax for 1917, until you have completed the audit for the years 1918 to 1921 inclusive, and if there has been overassessment for those years, set it off as a credit." The court then states (291 U.S. at page 61, 54 S.Ct. at page 328, 78 L.Ed. 647): "The applicable principle is fundamental and unquestioned. 'He who prevents a thing from being done may not avail himself of the nonperformance which he has himself occasioned, for the law says to him, in effect: "This is your own act, and therefore you are not damnified."' [Citing cases.] Sometimes the resulting disability has been characterized as an estoppel, sometimes as a waiver. The label counts for little. Enough for present purposes that the disability has its roots in a principle more nearly ultimate than either waiver or estoppel, the principle that no one shall be permitted to found any claim upon his own inequity or take advantage of his own wrong. [Citing case.] A suit may not be built on an omission induced by him who sues." (Citing other cases)

Plaintiff's claim, based upon the illegal credit issue, must be denied.