Bro-Jeff Theatres, Inc. v. Commissioner. Basbro Theatres, Inc. v. Commissioner. Basil Enterprises, Inc. v. Commissioner.
Bro-Jeff Theatres, Inc. v. Commissioner
Docket Nos. 4008, 4009, 4014.
United States Tax Court
1945 Tax Ct. Memo LEXIS 4; 4 T.C.M. (CCH) 1147; T.C.M. (RIA) 45385; December 29, 1945
*4 H. A. Mihills, C.P.A., 917 Munsey Bldg., Washington, D.C., for the petitioners. E. C. Algire, Esq., and Lawrence F. Casey, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these proceedings, consolidated for hearing and consideration, there are questioned respondent's determinations of deficiencies in income tax, declared value excess profits tax, personal holding company surtax, and penalties for failure to file personal holding company returns, Form 1120H. The deficiencies determined were as follows: Bro-Jeff Theatres, Inc. - Docket No. 4008
Fiscal year
ended
Tax, Penalty
Amount
May 31, 1940
Income tax
$ 5.24
May 31, 1940
Personal holding com-
pany surtax
2,002.59
May 31, 1940
25 percent penalty
500.65
May 31, 1941
Personal holding com-
pany surtax
3,060.53
May 31, 1941
25 percent penalty
765.13
May 31, 1942
Income tax
$ 4.72
May 31, 1942
Personal holding com-
pany surtax
1,307.74
May 31, 1942
25 percent penalty
326.94
Petitioner does not contest determinations of the income tax deficiencies. Basbro Theatres, Inc. - Docket No. 4009
Fiscal year
ended
Tax, Penalty
Amount
May 31, 1940
Personal holding com-
pany surtax
$ 850.05
May 31, 1940
25 percent penalty
212.51
May 31, 1941
Personal holding com-
pany surtax
1,941.56
May 31, 1941
25 percent penalty
485.39
May 31, 1942
Personal holding com-
pany surtax
867.95
May 31, 1942
25 percent penalty
216.99
May 31, 1942
Income tax
12.51
*5 Petitioner does not contest the determination of the income tax deficiencies. Basll Enterprises, Inc. - Docket No. 4014
Fiscal year
ended
Tax, Penalty
Amount
May 31, 1940
Income tax
$ 880.13
May 31, 1940
Personal holding com-
pany surtax
12,898.89
May 31, 1940
25 percent penalty
3,224.72
May 31, 1941
Income tax
3,541.69
May 31, 1941
Personal holding com-
pany surtax
11,807.52
May 31, 1941
25 percent penalty
2,951.88
May 31, 1942
Income tax
6,032.15
May 31, 1942
Declared value excess
profits tax
1,734.63
May 31, 1942
Personal holding com-
pany surtax
15,705.52
May 31, 1942
25 percent penalty
3,926.38
Two issues are common to the three cases: (1) Was each of the petitioners subject to the personal holding company surtax for the years involved? (2) If so, is each liable for a delinquency penalty for failure to file Forms 1120H, for each of the years involved? Two remaining issues arise in Docket No. 4014: (3) Did respondent correctly disallow a loss alleged to have been sustained in the taxable year ended May 31, 1941, by petitioner Basil Enterprises, Inc., in the demolition of certain buildings? (4) Did *6 respondent correctly adjust the allowable depreciation on four of petitioner's theatre buildings on the basis of a 50-year life instead of 33 1/3-year life, as claimed by petitioner, for the taxable years ended May 31, 1940, May 31, 1941, and May 31, 1942? Certain facts were stipulated in each of the cases; other facts were adduced at the hearing. Findings of Fact The stipulated facts are found accordingly. Each of the petitioners is a corporation organized under the laws of the State of New York with its principal office and place of business in Buffalo, New York. Its income tax returns for the taxable periods involved were filed with the collector for the 28th New York district. The books of account of petitioners have been audited and their tax returns prepared by the public accounting firm of Ernst and Ernst, who have served petitioners since about 1937; the firm also served as adviser on matters of accounting, business, and taxation. Basil Brothers Theatres (hereinafter referred to as the "partnership") is a co-partnership, formed January 1, 1927, composed of the following individuals, whose partnership interests for each of the taxable years involved, were as follows: *7 Name
Percent of interest
Nicholas J. Basil
29.25
Constantine J. Basil
25.00
Theophilos J. Basil
16.75
Basil J. Basil
25.00
V. Spencer Balser
4.00
The partnership operated various theatres and other properties owned or leased by petitioners. The four Basils are brothers. During the years in question each of the four brothers was an officer of and participated in the operations of each of the petitioners. Nicholas, until his death in 1943, acted as general manager of operations. The distributive shares of the partnership income for the taxable years here involved have been included in the respective Federal income tax returns of each of the brothers and the income and surtax paid thereon as follows: N. J.Basil
B. J. Basil
C. J. Basil
T. J. Basil
1940
Net taxable income
$15,986.43
$14,930.36
$14,287.59
$ 8,274.21
Normal and surtax
1,398.99
1,140.47
1,038.60
219.47
1941
Net taxable income
34,216.15
27,822.72
27,356.78
17,932.07
Normal and surtax
11,312.22
7,857.75
7,634.09
3,093.88
1942
Net taxable income
50,107.18
40,397.82
40,192.21
28,005.26
Normal and surtax
25,160.45
18,344.16
18,672.41
9,977.13
Personal Holding Company Issue
Bro-Jeff Theatres - Docket No. 4008.
*8 Petitioner was incorporated October 10, 1934, with an authorized capitalization of 500 shares of no-par value common stock, 292 shares having been issued and outstanding during each of the taxable years involved as follows: Shares
Name of Stockholders
Outstanding
Nicholas J. Basil
67
Constantine J. Basil
57
Theophilos J. Basil
38
Basil J. Basil
57
V. Spencer Balser
73
Total
292
Petitioner owns two buildings rented by the partnership in which are operated the Broadway Theatre and the Roxy Theatre. A third building was leased from its owner during the taxable year ended May 31, 1940, and was in turn sub-let to the partnership. The lease thereon terminated early in 1941 and was not renewed. The buildings owned by petitioner were, prior to its organization in 1934, owned in more than one individual name, and in order to get the buildings in one common name, they were transferred to petitioner upon its organization. For each of the taxable years involved more that 99 percent of petitioner's income was derived from rents paid by the partnership. The purpose of organizing petitioner and having it acquire the two buildings theretofore owned by the *9 individuals was to afford the individuals corporate protection with respect to any subsequent mortgages which might be placed upon the properties and with respect to any properties which might be subsequently acquired, and to protect them against any contingency which might arise to create personal liability through individual ownership of the properties. Petitioner's balance sheets for the years ended May 31, 1940, 1941, and 1942, are as follows: Assets
May 31, 1940
May 31, 1941
May 31, 1942
Cash
$ 188.21
$ 2,761.85
$ 9,462.45
Accounts
8.50
3,400.00
Buildings
76,613.88
76,613.88
76,213.88
Equipment
19,858.37
19,942.58
22,382.36
Land
14,675.00
14,675.00
14,675.00
Deferred charges
1,138.76
1,154.87
1,121.26
$112,482.72
$118,548.18
$123,854.95
Liabilities
Reserve for depreciation
$ 14,697.19
$ 19,178.35
$ 23,597.81
Accounts payable
2,666.10
1,285.61
2,367.29
Mortgages
39,000.00
38,000.00
36,000.00
Capital stock - common
34,233.30
34,233.30
34,233.30
Earned surplus
21,886.13
25,850.92
27,656.55
$112,482.72
$118,548.18
$123,854.95
For the taxable years involved petitioner reported the following amounts of *10 taxable income: Fiscal year ended
Amount
May 31, 1940
$3,314.40
May 31, 1941
4,669.87
May 31, 1942
4,510.42 Basbro Theatres, Inc. - Docket No. 4009. Petitioner was incorporated April 26, 1939, with an authorized capitalization of 200 shares of no-par value common stock. On May 7, 1942, an increase was authorized to 1,000 shares. The originally issued and outstanding stock consisted of 160 shares. On May 7, 1942, a change was made by the issuance of 23 additional shares. The shares were held as follows: April 26, 1939,
May 7, 1942,
to
to
Stockholder
May 7, 1942
May 31, 1942
Nicholas J. Basil
49
56
Constantine J. Basil
42
48
Theophils J. Basil
42
48
Basil J. Basil
28
32
161
184
Petitioner was organized for the general purpose of leasing theatre buildings and equipment from their owners when the same could not be purchased, and then sub-letting them to the partnership. Petitioner made necessary improvements on the leased buildings. It also performed the function of constructing new theatre buildings which after completion would be transferred to either Bro-Jeff Theatres, Inc., or Basil Enterprises, Inc. The purpose *11 of these operations was to protect the individuals in the event that any contingency arose either from the constructed theatre buildings or from the leased theatre buildings, which might create personal liability. During the taxable year ended May 31, 1942, petitioner had in process of construction the Colvin Theatre which had an accumulated cost at May 31, 1942, of $123,814.68. Completion and occupancy were suspended for lack of priorities for essential materials. In 1944 the building was completed. The unpaid balance of the cost as of May 31, 1942, was approximately $95,000. The only source of petitioner's income, other than small amounts of interest, was rents received from the partnership to which the theatre buildings and equipment were sub-let. Petitioner's principal deduction in determining taxable net income was for rent paid to the owners of the buildings, leaving an amount of profit for payment of taxes and purchase of capital items necessary for the operation of the theatres. The number of theatres leased by petitioner in 1939 was eight; in the taxable year 1942, three. A dividend was paid by petitioner to its stockholders during the taxable year ended May 31, 1942, in *12 the amount of $1,207.50. The petitioner's balance sheets for the three taxable years ended May 31, 1940, 1941, and 1942, are as follows: Assets
May 31, 1940
May 31, 1941
May 31, 1942
Cash
$ 288.62
$ 1,540.95
$ 954.79
Accounts
1,500.00
Equipment
1,802.78
2,510.88
3,841.20
Improvements to leased property
29,702.75
29,702.75
29,702.75
Deferred charges
10,802.10
12,616.97
8,541.42
Building in process
123,814.68
$ 44,096.25
$ 46,371.55
$166,854.84
Liabilities
Accounts payable
$ 4,603.58
$ 1,112.91
$ 98,120.22
Notes payable
7,500.00
Reserve for depreciation and
amortization
2,339.03
5,524.94
8,812.78
Capital stock
805.00
805.00
920.00
Paid-in surplus
35,169.81
35,169.81
46,554.81
Earned surplus
1,178.83
3,758.89
4,947.03
$ 44,096.25
$ 46,371.55
$166,854.84
For the taxable years involved petitioner reported the following amounts of taxable income: Fiscal year ended
Amount
May 31, 1940
$1,496.27
May 31, 1941
3,077.00
May 31, 1942
3,005.51
Basil Enterprises, Inc. - Docket No. 4014. Petitioner was incorporated December 13, 1929, with an authorized capitalization of 1,000 shares *13 of no par value common stock. Shares were issued and outstanding as follows: To
To
To
After
Name of Stockholder
May 31, 1938
Dec. 29, 1938
Sept. 20, 1941
Sept. 20, 1941
Nicholas J. Basil
140
154
175
203
Constantine J. Basil
120
132
150
174
Theophilos J. Basil
80
88
100
116
Basil J. Basil
120
132
150
174
Total
460
506
575
667
Petitioner owns and rents real estate and has consistently done so at all times since its organization. Since 1929 it has acquired a number of theatre buildings, equipped to be operated as theatres, some of which also contain offices, stores, and apartments. These buildings are operated and were so operated during the years involved by the partnership. More than 90 percent of petitioner's income during the years involved was derived from rent paid to it by the partnership for the rental of petitioner's properties. The purpose of organizing petitioner and having it acquire the buildtoings therefore owned by the individuals, as well as subsequently acquired properties, was to afford the individuals corporate protection with respect to any subsequent mortgages which might be placed upon the existing *14 properties and any properties subsequently acquired, and to protect them against any contingencies which might arise to create personal liability through the ownership of the properties. Petitioner's balance sheets for the taxable years ended May 31, 1940, 1941, and 1942, are as follows: Assets
May 31, 1940
May 31, 1941
May 31, 1942
Cash
$ 1,598.56
$ 3,104.08
$ 4,468.58
Accounts
31,043.23
1,874.59
4,585.22
Capital stock
25,995.76
Buildings
570,371.49
652,668.12
658,352.51
Equipment
111,493.83
140,302.20
150,788.21
Land
149,666.49
160,802.49
152,802.49
Deferred charges, etc.
9,170.07
11,074.90
9,693.42
$873,343.67
$995,822.14
$980,690.43
Liabilities
Reserve for depreciation
$184,751.03
$206,331.95
$227,261.49
Accounts payable
8,504.13
165,583.49
49,276.54
Notes payable
64,833.35
30,000.00
20,000.10
Mortgages
286,912.50
276,691.70
262,033.32
Capital stock - common
272,433.06
272,433.06
362,690.73
Earned surplus
55,909.60
44,781.94
59,428.25
$873,343.67
$995,822.14
$980,690.43
For the taxable years involved petitioner reported the following amounts of taxable income or (loss): Fiscal year ended
Amount
May 31, 1940
$13,972.17
May 31, 1941
(11,168.53)
May 31, 1942
29,309.97
*15 Penalty Issue Respondent has not asserted any taxes under section 500 et seq. of the Internal Revenue Code against Bro-Jeff Theatres, Inc., or Basil Enterprises, Inc., for any years prior to the taxable year ended May 31, 1940. Each of the petitioners regularly filed Federal income tax returns on Forms 1120 for all years of its existence. In each of these returns, where applicable, in response to the question thereon, "Is the corporation a personal holding company * * *," each petitioner answered, "No." No return on Form 1120H was filed for any year by any of the petitioners. Petitioners relied upon the advice of Benjamin Rath and Charles Wright, accountants and tax consultants in the employ of Ernst and Ernst for over 20 years, in not filing Forms 1120H. Rath and Wright, after considering the congressional reports and Treasury Department statements, issued prior to the passage of the amendatory personal holding company surtax sections and, later, the sections of the law and the applicable regulations, were of the opinion that petitioners were not intended to be taxed as personal holding companies. The question was not discussed with any representatives *16 of respondent's office. The accountants thereafter also placed some reliance upon the acceptance of income tax returns for the years 1937 and 1938 by respondent without raising the personal holding company question, particularly since protests had been filed with reference to 1936 income tax returns of the two petitioners then in existence, in which information regarding their stockholders was recited. After arriving at this opinion, neither Rath nor Wright examined later Treasury regulations or decisions interpreting the personal holding company sections. Nicholas J. Basil, with whom Rath and Wright held conferences regarding the filing of personal holding company returns, was aware of the delinquency penalty provisions for failure to file such returns. Demolition Issue - Docket No. 4014 For some years prior to 1938 petitioner leased the Jefferson Theatre, which was constructed in 1920, under a lease that was to terminate in December, 1942. The theatre was located in the Jefferson-Utica district of Buffalo, New York. It was operated as a theatre at all times. Anticipating difficulty in renewing the lease on the Jefferson Theatre and recognizing that even if the lease were *17 renewed the theatre was old and that the community needed and would support a new theatre, petitioner in 1938 purchased for the sum of $33,000 the Jefferson Apartments, located about two blocks distant from the Jefferson Theatre, intending to demolish the structure and erect on the site a new theatre. The Jefferson Apartments building was an old, three-story building of brick construction composed of apartments renting at not more than $20 to $25 per month. The building was thereafter carried on petitioner's books at a cost of $14,000. Since the apartment property was not large enough for a theatre, petitioner thereafter considered purchasing the Liberty Theatre, which adjoined the apartment property, being separated by an alleyway. At a directors' meeting, held November 10, 1938, the following action was taken: "The matter of purchasing the Liberty Theatre property was discussed and it was unanimously agreed that for the purpose of completing property purchases necessary for the future erection of a theatre in the Jefferson-utica district, that an offer of $35,000 be made to the Franklin Theatre Co., Inc., owners and operators of the Liberty Theatre, for the purchase of all their *18 buildings and equipment, consisting of a large building, housing the Liberty Theatre, and the lot being approximately 45 x 100 * * *" At a meeting held February 14, 1939, petitioner's directors unanimously agreed to purchase the Liberty Theatre for $40,000; it was also decided at that time to make an offer to purchase the Jefferson Theatre, which petitioner acquired sometime prior to October, 1939. On June 6, 1939, petitioner purchased the Liberty Theatre for $40,000. The cost of the building was entered upon petitioner's books at $14,747. The Liberty Theatre was thereafter operated as a theatre for over one year prior to its demolition, only slight alterations or improvements having been made, although the theatre was old and in need of general remodeling. The Liberty Theatre, prior to acquisition by petitioner, was competing with the Jefferson Theatre for patronage and had adopted "bingo nights" and other practices to attract business. After acquisition, these practices were discontinued and the theatre was operated at a loss by the partnership. At a directors' meeting held October 17, 1939, the following action was taken: "After discussion on the erection of a new theatre *19 on Jefferson Avenue near Utica Street, it was agreed "That the president of the corporation send a letter of authorization (in duplicate) to Mr. Michael DeAngelis, architect, to proceed with the plans and specifications of the new theatre. These plans are to be ready no later than February 15, 1940." Discussions continued with the architect concerning the erection of the new theatre, and in a directors' meeting of July 9, 1940, the following action was taken: "The President then informed the directors that after seven months, the final plans and specifications for the New Jefferson Theatre, prepared by Michael DeAngelis, architect, were ready. He also stated that three separate plans were prepared before the final decision was made and that the second set of plans was accepted with some ideas from the 1st and 3rd plans. The bids as received were in excess of $40,000.00, however, the corporation was inclined to spend this stipulated sum only, or else abandon the idea of building a new theatre, in which case the architect was to receive only $500.00 as full compensation for his service. Mr. Basil then asked the secretary of the meeting to read the letter sent to Michael DeAngelis *20 under date of Dec. 12th. (Note: This letter is filed in the minute book following the minutes of meeting of directors of October 17, 1939). After the letter was read Mr. Basil stated that after a conference with Mr. DeAngelis he agreed to accept 6% on $40,000.00 as full compensation for his services in connection with the plans for the new theatre, rather than lose this job. Mr. Basil then presented a contract dated July 10, 1940, submitted by the Paris Construction Company, as follows: Contract Proposal
$58,995.00
Changes & Omissions
18,232.00
Contract
$40,763.00
"After discussion it was decided that the board approve the contract with the Paris Construction Company for the construction of a theatre and commercial building to be located at 1348-52 Jefferson Avenue, for a total of $40,763.00. The contract was signed and the seal of the corporation attached thereto. "It was further approved that the present buildings located on this property (Liberty Theatre and Jefferson Apartment Building) be demolished for the purpose of constructing the new building and that the matter of financing the construction be left to the discretion of the company's officers." *21 The Jefferson Apartments and Liberty Theatre buildings were completely demolished in the taxable year ended May 31, 1941, and on the site of the two demolished structures the Apollo Theatre and the Liberty Shoe Store were constructed. By resolution adopted November 18, 1940, petitioner's directors wrote off the depreciated cost of the Jefferson Apartments building and the Liberty Theatre building to profit and loss. The reason for the action, and the history of the acquisition of the buildings appear in the minutes of that meeting, as follows: "Mr. N. J. Basil briefly outlined to the board the history behind the acquisition in 1938 of the apartments at 1350 Jefferson Avenue and the acquisition in June 1939 of the Liberty Theatre, adjacent to such apartment property. Summarized briefly the acquisition of these properties was made for the purpose of protecting the company's theatre interests in the Jefferson vicinity, as Mr. N. J. Basil stated, it was not known whether the lease for the Jefferson Theatre could be satisfactoril renewed or whether satisfactory terms could be reached for the purchase of such theatre. The Jefferson Theatre, formerly leased, Mr. Basil explained, was *22 acquired thru purchase in October 1939 and because of the apparent possibilities for the profitable operation of more than one theatre in that neighborhood, it was decided to operate two theatres. He further explained that the Liberty Theatre and Jefferson Apartment Building were operated by the corporation as rental units to July 1, 1940, at which time the buildings were demolished for the purpose of constructing a new theatre (THE APOLLO) on its site. "Mr. N. J.Basil informed the board that the net carrying value of the Jefferson apartment building and the Liberty Theatre Building, amounted to $27,369.28 at July 1, 1940, and it was his opinion that such net carrying value should be charged off against Profit & Loss for the current fiscal year on the books of the corporation." Depreciation Issue, Docket No. 4014 Respondent has not disturbed the 3 percent depreciation rate applied by petitioner to several of its theatre properties, but he has challenged such rate with respect to the following four theatres for the years shown: Cost Bases - Taxable Years
Theatre building
Acquired
Erected
1940
1941
1942
Strand
1931
1924
$ 73,433.60
$ 76,189.15
$ 97,813.74
Genesee
1929
Prior to 1929
223,636.08
224,047.28
224,047.28
La Salle
1937
1937
91,969.22
99,595.50
99,595.50
Apollo
1941
1941
80,691.75
82,476.75
*23 Respondent has allowed depreciation on these buildings at a rate of 2 percent, based on a 50-year physical life for each building. For the fiscal year ended May 31, 1940, petitioner's buildings had an aggregate cost of $570,371.49; for the fiscal year ended May 31, 1941, an aggregate cost of $652,668.12; for the fiscal year ended May 31, 1942, an aggregate cost of $658,352.51. Each of the four theatre buildings is operated as a community theatre located in the residential sections of Buffalo. The Strand Theatre building, erected in 1924, is of old-fashioned design, lacks adequate toilet facilities and other improvements, has no airconditioning nor parking space. It was completely remodeled sometime after its acquisition. It has a fire-proof roof. The Genesee Theatre building contains not only a theatre but stores, apartments, and offices as well. It is of old-fashioned design, has a balcony which has been closed off and not used. It has no parking facilities and, because of the traffic in the neighborhood, this lack is particularly significant. The LaSalle Theatre building is not of fireproof construction; it has a steel frame, masonry walls, steel girders, and wooden roof. *24 Its interior finish is of celotex board. Parking facilities are available. The Apollo Theatre building, completed in 1941, contains the theatre and one store: it has outside walls constructed of cinder blocks; has no parking facilities, and is of poor exterior design. Its acoustical materials are in poor condition. Among the factors which affect the useful life of community theatres are changes in styling, entry of more modern theatres into the community area, general improvements made in the showing of motion pictures, neighborhood changes, and the non-adaptability of such theatres for other purposes. The physical life of these buildings would be about 50 years. Useful life might be increased with extensive remodelings, approaching in extent the original cost. The anticipated useful life of the four theatre buildings, including obsolescence, is not more than 33 1/3 years. Opinion 1. That at least 80 percent of petitioners' gross income was holding company income within the meaning of Internal Revenue Code, section 501 (f), follows from our decision in Furniture Finance Corp., 46 B.T.A. 240, which petitioner makes no effort to distinguish. *25 Under that case it is clear that amounts received as compensation for the use of a corporation's property from stockholders owning more than 25 percent of the stock is personal holding company income notwithstanding that the stockholders in question are associated in a partnership. Since, in addition, petitioners concede that "they come well within the prescribed test of stock ownership" under the personal holding company definition, this issue must be decided in favor of respondent. 2. If petitioners are to escape the penalty for failure to file personal holding company returns, it must be on the ground "that such failure is due to reasonable cause and not due to wilful neglect." Our discussion of this phase of the case will deal with the issue as it is presented by petitioners. They say: Counsel for the petitioners herein makes no contention whatsoever that the petitioners should be relieved of any liability for a delinquency penalty merely because petitioners relied upon the opinions expressed by their accountants * * * it is only if this Court should satisfy itself that the accountants had reasonable cause to believe that no returns should be filed, that these petitioners may *26 expect to be relieved of a penalty * * * It is unnecessary to consider whether during the years immediately succeeding their enactment one purporting to be conversant with income tax law, regulations, and decisions might have been justified in reaching an erroneous conclusion as to the scope of the personal holding company provisions. The earliest year here in question is that ending May 31, 1940, calling for a return about midsummer of that year. By that time the statute in question had been in effect for several years. See Renton Investment Co., 46 B.T.A. 279, 291, reversed, other grounds (C.C.A., 3rd Cir.), 131 Fed. (2d) 330. Of even more significance the case of Noteman v. Welch (C.C.A., 1st Cir., 1939), 108 Fed. (2d) 206, had then been decided. One aware of this development, even though still in doubt as to the precise scope of the holding company sections cannot be said to have had reasonable cause for failing to file any return whatsoever, at least without making some effort to ascertain what the official ruling applicable to his precise situation would be. See Rafael Sabatimi, 32 B.T.A. 705, affirmed, this issue, (C.C.A. *27 , 2nd Cir.), 98 Fed., (2d) 753. We are totally unsatisfied that petitioners' "accountants had reasonable cause to believe that no return should be filed," for the years here in dispute. We conclude that respondent's determination as to the penalties was proper. Furniture Finance Corp., supra.
3. The petitioner's intention at the time of acquisition with respect to treatment of the buildings ultimately demolished is determinative of whether their cost may be charged off as petitioner contends or must be capitalized. Providence Journal Co. v. Broderick (C.C.A., 1st Cir.), 104 Fed. (2d) 614; Lansburgh & Bro., Inc., 23 B.T.A. 66. Aside from the burden of proof, the record as a whole justifies only the conclusion that at the time the property was purchased, it was petitioner's intention to demolish the buildings in order to make way for the erection of a new theatre. The first building to be bought was an apartment house. No motive for its purchase is shown or can be envisaged consistent with petitioner's business operations, except the acquisition of a site for a theatre. While the contiguous property was then occupied by a theatre, it was obviously *28 outdated and the declared purpose of buying it was merely to enlarge the site. In slightly more than four months we find petitioner's directors authorizing employment of an architect to draw plans for the new theatre. At no time were any structural improvements or alterations considered which would make the old theatre a profitmaking venture. And that there were delays pending actual demolition is, in the light of petitioner's manifest purpose, of no controlling significance. Providence Journal Co., supra.On this issue the deficiency is sustained. 4. There seems to be no serious controversy as to the probable physical life of petitioner's depreciable property. The dispute is whether the buildings are subject to accelerated depreciation because their useful economic life may be anticipated as shorter than that of the brick and steel of which the structures are composed. If the facts support petitioner in that position, its claim to the higher depreciation rate is justified. See Illinois Pipeline Co., 37 B.T.A. 1070. We think they do. The rate in question has been applied for some years without controversy, a circumstance having some bearing upon the question *29 of its reasonableness. Illinois Pipeline Co., supra. Considering petitioner's actual experience, as well as the several factors brought out in the record which demonstrate a combined tendency to shorten the useful economic life of motion picture theatres, we find it impossible to conclude that the useful life of 33 1/3 years adopted by petitioner, as opposed to the 50-year life urged by respondent, is so at variance with reasonable estimates as to authorize us to require its adjustment. See Real Estate-Land Title & Trust Co. v. United States, 309 U.S. 13. On this issue respondent's action is disapproved. Burnet v. Niagara Falls Brewing Co., 282 U.S. 648. Decisions will be entered for respondent in Docket Nos. 4008 and 4009, and under Rule 50 in Docket No. 4014.