**MUTUAL OF OMAHA INSURANCE CO. and Consolidated Subsidiaries, Plaintiffs,**

**v.**

**UNITED STATES of America (Internal Revenue Service), Defendant.**

**No. 8:02CV162.**

United States District Court, D. Nebraska.

March 23, 2004.

---

Jeffrey J. Pirruccello, Vicki Colwell, McGrath, North Law Firm, Omaha, NE, for Plaintiff.

Gerald B. Leedom, U.S. Department of Justice, Washington, DC, for Defendant.

## MEMORANDUM AND ORDER

SHANAHAN, District Judge.

This matter is before the court on the parties' motions for summary judgment (Filing Nos. 29 and 33). For the reasons stated herein, the court grants in part and denies in part the Plaintiff's motion for summary judgment (Filing No. 29); likewise, the court grants in part and denies in part the Defendant's cross-motion for summary judgment (Filing No. 33).

### I. INTRODUCTION

The Plaintiff's consolidated taxable group realized taxable capital gains from 1990–1992. The Plaintiff claims that these gains are subject to tax at the rate of 31.6%, on the other hand, the United States contends that the capital gains are correctly subject to tax at the rate of 34%. Most of the gains (78.45%) occurred when notes or bonds were "called" by the issuer—at the issuer's discretion—prior to the explicit maturity date specified by the issuer in the debt instruments (hereinafter, these securities are "Category A Securities"). A smaller percentage of the gains (21.55%) resulted when a fraction of the principal on a note or bond was prepaid by the issuer, or when a portion of a bond issue was prepaid by the issuer, in

accordance with a schedule of serial prepayments specified in the instruments (hereinafter these securities are "Category B Securities").

Critical to the outcome of this case is the construction of the Tax Reform Act of 1986 ("TRA") § 1011(d) and the Technical and Miscellaneous Revenue Act of 1988 ("TAMRA") § 1010(a), which set forth favorable tax rates for certain capital gains realized by a qualified life insurance company, such as Mutual of Omaha. In order to qualify for the favorable tax rate (31.6%), the securities must be market discount bonds and must have been redeemed at maturity. Mutual of Omaha argues that both the Category A and B Securities were redeemed at maturity. The United States contends, however, that the normal 34%-gains rate applies (1) to "called" securities, because the prematurity call of a note or bond is not a "redemption at maturity," and (2) to the "pre-maturity" partial prepayments of principal on so-called "scheduled" or "serial" securities, because the pre-maturity prepayment of principal is not a redemption "at maturity," and, even if it were, a partial prepayment that does not liquidate or retire the entire bond or note is not a redemption of "any market discount bond."

## II. FINDINGS OF FACT

1. Before Congress enacted the Deficit Reduction Act of 1984 ("DEFRA"), a taxpayer was permitted to recognize capital gain or loss (as opposed to ordinary income) on the difference between the amount such taxpayer received upon a sale or other taxable disposition of a security (including a market discount security that was held for investment) and the security's basis. This was favorable to corporate taxpayers because capital gain was taxed at an income tax rate of twenty-eight percent (28%) compared to the income tax rate of thirty-four percent (34%) imposed on the ordinary income of corporate taxpayers at such time.

2. A market discount security is a security which has been purchased after its issuance at a discount loan from its stated redemption price, where the discount is created by the market place (*i.e.*, market discount).

3. Section 1276 of the Internal Revenue Code ("I.R.C.") (added by DEFRA) changed that treatment for market discount securities by requiring that any gain recognized on the disposition of such securities was to be treated as ordinary income to the extent of the accrued market discount. However, a "grandfather" provision allowed corporations to continue to receive capital gain treatment for gains recognized on the disposition of accrued market discount securities, if such securities were issued before July 19, 1984 (the date of DEFRA's enactment).

4. The Tax Reform Act of 1986 ("TRA") § 311 eliminated the income tax rate advantage for capital gain by raising the income tax for corporate capital gain from twenty-eight percent (28%) to the new highest corporate tax rate imposed on ordinary income, thirty-four percent (34%). This tax rate increase was generally effective for tax years beginning in 1986.

5. However, TRA § 1011(d) provided a transitional rule for certain life insurance companies. TRA § 1011(d) provided that the gain recognized by a "qualified life insurance company" on the "redemption at maturity" of any "bond (meaning, any bond, debenture, note certificate or other evidence of indebtedness under I.R.C. of 1986 § 1278) issued before July 19, 1984, and acquired by such life insurance company on or before September 25, 1986 (the date of TRA's enactment), would be subject to tax at the rate of twenty-eight percent (28%)".

6. TRA § 1011(d)(2) defined "qualified life insurance company" to mean any of fifteen specifically-named companies, one of which was Mutual of Omaha Insurance Company.

7. Section 1010(a)(2) of the Technical and Miscellaneous Revenue Act of 1988. ("TAMRA") amended TRA § 1011(d) to provide as follows:

> In general: Notwithstanding the amendments made by subtitle B of title III [of TRA § 1011(d) ], any gain recognized by a qualified life insurance company on the redemption at maturity of any market discount bond [as defined in Section 1278 of the Internal Revenue Code of 1986] which was issued before July 19, 1984, and acquired by such company on or before September 25, 1985, shall be subject to tax at the rate of 31.6 percent.

8. Under the I.R.C. of 1986 § 1278, the term "bond" was defined to mean "any bond, debenture, note, certificate or other evidence of indebtedness."

9. The term "redemption at maturity" is not defined in TRA, TAMRA, committee reports, the I.R.C. or the Department of Treasury Regulations.

10. Mutual of Omaha-Insurance Company is a Nebraska corporation with its principal place of business at Mutual of Omaha Plaza, Omaha, Nebraska 68175.

11. Mutual of Omaha Insurance Company timely filed a consolidated income tax return with its subsidiaries, including United of Omaha Life Insurance Company, United World Life Insurance Company, and Companion Life Insurance Company, for each of the calendar years 1990 through 1992. Such income tax returns are collectively referred to herein as "the Returns."

12. Defendant is the United States of America (Internal Revenue Service).

13. This is an income tax refund suit filed by the Plaintiff to recover internal revenue income taxes and interest assessed against and collected from the Plaintiff for the taxable years ended December 31, 1990, December 31, 1991, and December 31, 1992, plus interest on any overpayment determined by the court.

14. Jurisdiction is conferred by 28 U.S.C. § 1346(a)(1).

15. The Plaintiff's claims for refund and this refund suit arose as follows: After an Audit by the IRS of the Returns, the IRS assessed an income tax deficiency of $950,398, plus interest for calendar years 1990 through 1992 ("Taxes"), against the Plaintiff.

16. Plaintiff paid the Taxes in full on or about April 21, 1998.

17. On December 8, 1998, the Plaintiff timely filed Forms 1120X, Amended U.S. Corporation Income Tax Returns with adjusted Forms 1120–PC, U.S. Property and Casualty Insurance Company Income Tax Returns, serving as claims of refund for the Taxes and other then disputed amounts for calendar years 1990 through 1992.

18. On May 18, 2000, the Plaintiff signed Form 2297, Waiver of Statutory Notification of Claim Disallowance, with respect to the Defendant's disallowance of the claims for refund for the Taxes.

19. Plaintiff timely filed the Complaint in this action on April 3, 2002.

20. On the Returns Plaintiff reported certain taxable capital gains attributable to scheduled principal payments or the call for redemption of the Securities, at the transitional capital gain tax rate of 31.6% under TRA § 1011(d) and TAMRA § 1010(a).

21. All of the Securities were issued prior to July 19, 1984 by various issuers in

accordance with TRA § 1011(d) and TAMRA § 1010(a).

22. All of the Securities were acquired by the Plaintiff before September 25, 1985 in accordance with TRA § 1011(d) and TAMRA § 1010(a).

23. All of the disputed capital gain was recognized by a "qualified life insurance company" in accordance with § 1011(d) and TAMRA § 1010(a).

24. The Securities were "market discount bonds" within the terms of TAMRA § 1010(a) and the I.R.C. of 1986 § 1278.

25. All of the Securities were either "redeemed" upon the exercise of a call provision by the applicable issuer or "paid" (in whole or part) by the applicable issuer in accordance with the serial principal payment schedule set forth in the applicable Security in calendar years 1990 through 1992.

These "redemptions" or "payments", therefore, occurred either

(A) on "call dates" as set forth in the Securities' express terms and conditions (*i.e.*, the Category A Securities) (representing 78.45% of the capital gain in dispute in this lawsuit), or

(B) on scheduled, serial payment dates as set forth in the Securities' express terms and conditions (*i.e.*, the Category B Securities) (representing 21.55% of the capital gain in dispute in this lawsuit).

26. The capital gains arising from Category A Securities for the years 1990–1992 was $31,344,623. The capital gains arising from Category B Securities for the years 1990–1992 was $8,611,231. The grand sum total of both of these gains is $39,955,854.

27. A summary of excerpts from 15 representative examples of Category A Securities are contained in Plaintiff's Exhibit 4H.

28. A summary of excerpts from 15 representative examples of Category B Securities are contained in Plaintiff's Exhibit 4I.

29. Plaintiff did not sell any of the Securities to a third party or negotiate with any of the applicable issuers for the redemption of any of the Securities.

30. Plaintiff was contractually required to accept payment from the applicable issuers of the Securities when called for redemption or upon scheduled, serial principal payment dates pursuant to the terms and conditions of the Securities.

31. A representative example of a transaction for the Category A Securities is the following: *Georgia Power Company, First Mortgage Bonds, 9⅝% Series due May 1, 2008.* This Security was one in a series of Securities secured by an indenture or mortgage or deed of trust dates as of March 1, 1941. United of Omaha Life Insurance Company purchased the Security on the open market on April 23, 1984 with a par value of $4,450,000 and at a cost of $3,157,987. Georgia Power Company exercised its call right under the Security's terms. Due to the exercise of the call right and upon payment for the Securities, the Plaintiff surrendered the Securities for redemption on May 22, 1992. The total consideration received was $4,648,915, which was determined by multiplying the par value of $4,450,000 by 1.0447, which was the redemption factor required under the Security's terms.

32. A representative example of transactions for Category B Securities are the following: *Norton Simon, Inc., 9⅞% Promissory Note due June 1, 2004.* United of Omaha Life Insurance Company purchased these Securities on the open market on March 2, 1983 and April 24, 1984, respectively. Pursuant to the Security documents, Norton Simon Inc. was required to pay $11,900,000 in principal each year commencing June 1, 1984 and continuing to and including June 1, 2003 with-

out a redemption premium. United of Omaha received $476,000 in proceeds for each of the years 1990 and 1991, and taxable gains were recognized in the amounts of $43,757 and $47,637, respectively. (The balance of the outstanding principal of the Security was redeemed in 1992 by the issuer's exercise of its call right under the terms of the Security and constitutes a Category A Security gain.)

33. The Plaintiff's own bond and note exhibits (Pltf. Exs. 4H and 41, with tabs)—which the Plaintiff names as "representative" of the Securities—reflect that the "call" of certain of the Securities, at the option of the issuer, were redemptions *prior to maturity. See, e.g.,* Pltf. Ex. 4H, Tab 1B at bates-stamped page 09598 (Georgia Power Company bonds "redeemable at the option of the Company . . . prior to maturity").

## III. APPLICABLE STANDARDS

### A. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Harder v. Acands,* 179 F.3d 609, 612 (8th Cir.1999). "In making this determination, the function of the court is not to weigh evidence and make credibility determinations, or to attempt to determine the truth of the matter, but is, rather, solely, to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *see Hedges v. Poletis,* 177 F.3d 1071, 1074 (8th Cir.1999). The court views the evidence in the light most favorable to the non-moving party, *see Get Away Club, Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir.1992), and gives the nonmoving party the benefit of all reasonable inferences to be drawn from the evidence. *See Moore v. Webster,* 932

F.2d 1229, 1230–31 (8th Cir.1991). The court must "look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Dulany v. Carnahan,* 132 F.3d 1234, 1237 (8th Cir.1997) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). The moving party "bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law." *Shelter Insurance Companies v. Hildreth,* 255 F.3d 921, 924 (8th Cir.2001).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses and the rule should be interpreted in a way that allows it to accomplish this purpose. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990) (quoting *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548).

Both sides essentially agree that this case is properly resolved on summary judgment. The United States contends that there is no genuine dispute as to Plaintiff's proposed statement of material facts, except for paragraphs 9, [21], 26, and 33. The court notes the United States does not necessarily disagree with any proposed fact in these paragraphs; rather, the United States disagrees with how Mutual of Omaha characterizes certain financial transactions. In other words, some of

the facts Mutual of Omaha asserts are not facts, but arguments. The court agrees with the Defendant, and finds no disputed issue of material fact.

The questions presented to the court are principally a legal ones: whether the Securities at issue were redeemed at maturity (as the Plaintiff contends) or before maturity (as the United States contends), and whether a "scheduled" prepayment of less than the entire balance of a note is a redemption of a market discount bond. Both questions are properly resolved at the summary-judgment stage as there are no material facts at issue with respect to either of these questions, and both present questions of how to construct Section 1010(a)(2) of TAMRA.

## B. Burden of Proof and Statutory Construction

The United States contends that the Plaintiff bears a heavy burden of showing that it is entitled to the special tax rate. The United States analogizes the situation in this case to a taxpayer's claim for an exemption or deduction. Quoting from various cases which hold that exemptions or deductions are matters of "legislative grace," the United States argues Mutual of Omaha must prove its case by clear and convincing evidence.

 The court does not find the analogy compelling. The dispute in this case does not involve a tax exemption of potentially broad application, nor does this case concern a deduction Rather, this lawsuit concerns the application of a transitional rule or grandfather provision that provides specific relief to life insurance companies, such as the Plaintiff, from a tax increase that would otherwise apply to capital gains recognized on the redemption of their qualified securities: In tax refund cases such as this one, the taxpayer, here Mutual of Omaha, must prove its case by a preponderance of the evidence. *See North*

*Dakota State University v. United States,* 255 F.3d 599, 603 (8th Cir.2001) (holding "tax assessments made by the IRS are presumed correct and the taxpayer bears the burden of proving, by a preponderance of the evidence, that the assessment is erroneous").

 Nevertheless, as the Plaintiff points out, the burden-of-proof issue is not the crux of this case insofar as there is not a genuine dispute over the material facts. Rather, the outcome of this case pivots on the construction of the phrase "redemption at maturity." Under the rules of statutory construction, federal tax legislation that is intended to provide relief is to be liberally construed in favor of the taxpayer. *Burnet v. Niagara Falls Brewing Co.,* 282 U.S. 648, 654, 51 S.Ct. 262, 75 L.Ed. 594 (1931); *Loco Realty Company v. Comm'r,* 306 F.2d, 207 (8th Cir.1962) (the Eighth Circuit indicated that the Tax Court had said repeatedly, that the tax statute in question embraced a relief-provision and was to be construed liberally in favor of the taxpayer in order to effectuate its purpose). This principle of statutory construction has been applied repeatedly to transitional rules with relief provisions that have limited applicability, such as TAMRA § 1010(a). The court adopts this principle for this case: the court will liberally construe Section 1010(a)(2) of the Technical and Miscellaneous Revenue Act of 1988 ("TAMRA") in favor of the Plaintiff.

## IV. ANALYSIS

Section 1010(a)(2) of the TAMRA amended TRA § 1011(d) to provide as follows:

In general. Notwithstanding the amendments made by subtitle B of title III [of TRA § 1011(d) ], any gain recognized by a qualified life insurance company on the redemption at maturity of

any market discount bond [as defined in Section 1278 of the Internal Revenue Code of 1986] which was issued before July 19, 1984, and acquired by such company on or before September 25, 1985, shall be subject to tax at the rate of 31.6 percent.

In order for the gain on the Plaintiff's Securities to qualify for the favorable capital gain rate under Section 1010(a)(2) of the Technical and Miscellaneous Revenue Act of 1988 ("TAMRA"); which amended TRA § 1011(d) the following requirements must be met: (1) the Plaintiff's Securities must be market discount securities; (2) the Securities must have been issued before July 19, 1984; (3) the Plaintiff must have acquired the Securities before September 25, 1985; (4) the Plaintiff must be a qualified life insurance company; (5) the Securities must have been redeemed; and (6) the Securities must have been redeemed "at maturity." The United States concedes that requirements one through five are met with respect to Category A Securities and the United States concedes that issues one through four are met with respect to Category B Securities.

## A. Category A Securities

With respect to the phrase redeemed "at maturity," the court gleans from the parties' briefs there are three possible ways in which to understand what Congress meant when it enacted Section 1010(a)(2) of TAMRA. The court next addresses these three constructions of the phrase "at maturity."

■ The United States first argues that the term "at maturity" is a relative term having in essence no meaning except the meaning given to it by the parties: "in the absence of more specific guidance from Congress concerning what it meant by the term 'at maturity,' one must simply and logically presume that Congress left to the parties to various bonds and notes delineation of whether the issuer's particular 'ear-

ly call' or 'serial payment' was or was not 'at maturity.'" (Filing No. 34 at 17–18.) The United States continues: "the bond and note exhibits (Pltf. Exs. 4H and 4I, with tabs)—which the Plaintiff concedes are 'representative'—make clear that the 'call' by the issuer, at its unilateral option, was a redemption *prior to maturity.*" (Filing No. 34 at 22) (citing Pltf. Ex. 4H, Tab 1B at bates-stamped page 09598 (Georgia Power Company bonds "redeemable at the option of the Company . . . prior to maturity")).

The court does not find this argument compelling in the least. Just because a legislative enactment, due to the open texture and vagueness of words and language, fails to supply parties with pure untarnished certainty as to its meaning, does not entail the absence of any meaning of the law. Moreover, the lack of guidance as to a statute's meaning does not indicate by inference that the parties themselves get to define the scope and meaning of ambiguous terms.

■ Under the United States' first theory, the parties in this case would determine which activities fall within the ambit of "redemptions at maturity." In its reply brief, the Plaintiff correctly notes that if a security merely provided that the term "maturity" meant "the date on which the principal of such security becomes due and payable, whether at its stated maturity or by declaration of acceleration, call for redemption or otherwise," then the taxpayer would obtain the benefit of the transitional rule. (Filing No. 41.) Giving the parties free reign to define "at maturity" strikes the court as unreasonable. The well-settled case law is that where a term is not defined, the court should look to a term's ordinary and natural meaning; dictionaries are often used under such circumstances to determine a term's ordinary and natural meaning. *See F.D.I.C. v. Meyer,*

510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994).

The United States sets forth a second construction of the phrase "at maturity." According to this construction, the United States contends the phrase is not ambiguous, and the case law settles or, at least indicates, that "at maturity" refers only to the *stated* maturity date of the securities. Accordingly, the "call" by the issuer of a note or bond—which occurs before the stated maturity date—is not a "redemption at maturity" of a market discount bond, but rather, is a redemption **prior to** maturity.

Certainly, the Plaintiff's own bond and note exhibits (Pltf. Exs. 4H and 4I, with tabs)—which the Plaintiff names as "representative" of the Securities—evidence that "at maturity" may refer to the *final* or *stated* maturity date of the security. Moreover, the Plaintiff does not seem to argue with this contention. That "at maturity" may in some contexts refer to the *stated* maturity date does not mean that every time Congress uses the term that "at maturity," it is referring to the *stated* maturity date of a bond or note. Context matters.[1] "The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context...'" *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (internal citations omitted).

The Securities that the parties have submitted as evidence provide that the issuer may redeem them by placing a "call" *prior to* maturity. In this context, the word "maturity" necessarily refers to the *stated* maturity date. However, the clarity that exists in the Securities with respect to the meaning of the word "maturity"—due to the context—is lacking in Section 1010(a)(2) TAMRA.

The Plaintiff contends that the term "at maturity" is ambiguous within the context of TAMRA. The Plaintiff argues that a reasonable person could interpret "maturity" to mean either the *final or stated* maturity date, but, also could interpret "maturity" to mean the date on which an issuer unilaterally calls or redeems a security. In essence, the Plaintiff maintains that the "call" accelerates the maturity of the security. The court agrees with the Plaintiff. There are in essence two maturity dates: first, the stated date, and second, the unspecified and uncertain date that the obligor may designate by accelerating the maturity of the debt instrument via a call.

In the absence of a definition, a court should "construe a statutory term in accordance with its ordinary or natural meaning." *F.D.I.C. v. Meyer*, 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *see also Missouri Mun. League v. F.C.C.*, 299 F.3d 949, 953 (8th Cir.2002) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)) ("[w]e begin with the language Congress used, and, because the statute does not define the term 'entity,' we presume that 'the ordinary meaning of that language accurately expresses the legislative purpose.'") Basic legal dictionaries demonstrate the reasonableness of the Plaintiff's interpretation of the term "maturity." For example, Black's Law Dictionary defines "maturity date" to mean: "The date on which the principal amount

---

1. To take an extreme example: while there may be some reasonable dispute as to what the term "redemption" means in TAMRA, clearly "redemption" does not refer to "a deliverance from the bondage of sin." Webster's Third New International Dictionary 1902 (1993).

of a note, draft, acceptance, bond, or other debt instrument becomes due and payable." BLACK'S LAW DICTIONARY 979 (7th ed.1999).

As the Plaintiff states—and really without any objection from the United States—, "when an issuer calls a security, such as a Category, A Security, there is no question that the security is then due and payable, just as on the final or stated maturity date." (Filing No. 30 at 27.) Moreover, Congress could have qualified the phrase "at maturity" to mean only the *stated* maturity or *final* maturity if Congress had desired to treat call dates and *stated* maturity dates differently. The court finds the plain and ordinary meaning of the term "at maturity" to include the activities of issuers exercising a call provision in the security.

At the very least, the court finds the use of the term "at maturity" to be ambiguous. Employing the principle that transitional rules with relief provisions that have limited applicability are to be applied in favor of the taxpayer the court finds that redemptions at maturity include certain market discount securities that were redeemed pursuant to the exercise of express call provisions by the applicable issuers of the securities on accelerated maturity dates.

The Category A Securities meet all the requirements of Section 1010(a)(2) of TAMRA. Accordingly, the Plaintiff should have only paid a 31.6% tax rate instead of a 34% tax rate for the capital gains on the Category A Securities. The court grants summary judgment for the Plaintiff with respect to Category A Securities.

## B. Category B Securities

The government contends the Category B Securities were neither redeemed nor redeemed "at maturity." The United States maintains that prepayments made before the final, stated maturity date specified in the debt instruments are not redemptions made "at maturity." Moreover, the United States argues that prepayments made before the stated maturity dates are not "redemptions" of a bond or note, they are what they purport to be, *i.e.*, prepayments of principal.

■ The court has already accepted the following as a reasonable definition of "maturity": "The date on which the principal amount of a note, draft, acceptance, bond, or other debt instrument becomes due and payable." BLACK'S LAW DICTIONARY 979 (7th ed.1999). When an issuer, pursuant to a serial security, such as a Category B Security, is required to make scheduled principal payments on stated dates, part of such security becomes due and payable on such stated dates. The holder must accept the scheduled principal payment for the security from the issuer. Nevertheless, the entire principal of the note or bond is not due. The question presents itself whether a partial prepayment occurring on the due date is paid "at maturity". Of course, the term "at maturity" must be read in the context of the phrase "redemption at maturity."

With respect to the term "redemption," the court, again, notes that in the absence of a definition, a court should "construe a statutory term in accordance with its ordinary or natural meaning." *F.D.I.C. v. Meyer*, 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Black's Law Dictionary defines "redemption" to mean: "Repurchase of notes, bonds, stock, bills, or other evidences of debt, by paying their value to their holders. The payment of principal and unpaid interest on bonds or other debt obligations." BLACK'S LAW DICTIONARY 1278 (7th ed.1999). There is some degree of conflict within this definition as to whether a "redemption" requires the *complete* satisfaction of one's indebtedness in order to redeem a debt instrument.

As stated in *Felin v. Kyle,* 102 F.2d 349 (3rd 1939):

> It is true that the word 'redemption' is defined as a 'buying back; a purchase back; a repurchase'. However, as so defined, it is used chiefly in connection with the redemption by a mortgagor of his mortgaged property, or by a pledgor of pledged property or in similar situations. When it is applied to a transaction in which a corporation redeems certain outstanding bonds or notes, for the purpose of cancelling them, the word 'redemption' carries with it the idea of 'paying back' or 'satisfying one's indebtedness'.

*Fe[l]in,* at 350.

This court determines that a "redemption at maturity of any market discount bond" necessarily requires the *complete* satisfaction of a debt. Merely paying back what is due under the terms of the debt instrument does not redeem the bond at maturity. While it is true that "redemption" can mean simply "the payment of an obligation," within the context of TAMRA, the court finds that a bond must be redeemed *in toto* to qualify for the special 31.6% tax rate. In accordance with this finding, each scheduled principal payment of a Category B Security on the stated due date required by the express terms of each Category B Security is *not* considered a "redemption at maturity."

Of course, the IRS and the Plaintiff have pointed out the anomalous result that occurs.

> Given the example of a 30–year bond with 120 payments of principal and interest, only the last payment will be a payment at maturity. Any gain recognized on the 120th of the principal that is paid on that date will be gain that is recognized at maturity. The 119 payments that precede it will not have recognized gain recognized at maturity, although they seem otherwise identical to the final payment. Furthermore, the tax consequences would be different if the issuer had issued 120 separate bonds, each with a maturity date three months after the previous one.

(Plaintiff's Exhibit 1RR.)

The Plaintiff uses this example to argue that "the Plaintiff and other life insurance companies should not lose the benefit of the transitional capital gain tax rate under TRA § 1011(d) and TAMRA § 1010(a) merely because they acquired serial securities, subject to scheduled [partial prepayments of principal] . . . , rather than multiple securities with essentially the same terms as the serial securities." (Filing No. 30 at 36.) However, the court remains unconvinced: the tax consequences of legislation certainly need not be logical, and, moreover, Congress may engage in fiscal folly and tax tomfoolery. In a more fundamental legal approach to the situation regarding Class B Securities: different facts lead to different results.

The Plaintiff makes an additional argument. The Plaintiff asks the court to look at the "substance" of the "serial" Category B Securities. The Plaintiff contends that the substance of each Category B Security represents several securities, with a separate security being fully paid (in total) on each stated payment date.

The court disagrees with the Plaintiff, and concurs with the United States the form of the bond or debt instrument is the substance. A serial security is a single security and is not in form or substance multiple securities. Within a serial security, there is still only one final maturity date and only one "redemption at maturity" occurs. As the Defendant states: "a prepayment of a portion of principal is precisely that—a prepayment of a portion of principal." (Filing No. 34 at 25.) No complete satisfaction of debt occurs when only a partial amount of the principal is

1128

paid (except for, of course, when the final payment is made).

With respect to the Plaintiff's Category B notes and bonds, the court finds: (1) prepayments made before the stated maturity date are not "redemptions" of a bond or note they are what they purport to be, *i.e.*, prepayments of principal; and (2) prepayments made before the maturity date specified in the debt instrument are not redemptions made "at maturity." Accordingly, the court grants summary judgment for the Defendant with respect to the Category B Securities. The Plaintiff properly paid the proper tax rate of 34% on the Category B Securities capital gains, and is not entitled to any refund.

## C. Calculation of Refund

The total capital gain arising from the Securities called for redemption by the applicable issuer (the Category A Securities) for the years 1990–1992 is $31,344,623. The Plaintiff paid the tax rate of 34% on these gains rather than the correct rate of 31.6% as authorized under Section 1010(a)(2) of TAMRA. The difference between (.34)($31,344,623) and (.316)($31,344,623) is $752,270.95. Accordingly, the court will award the Plaintiff a tax refund of $752,270.95, plus the interest payments associated therewith (collectively "Taxes"), together with statutory interest thereon from the date of payment of such Taxes on April 21, 1998, as calculated pursuant to 28 U.S.C. § 2411.[2]

## V. CONCLUSION

The phrase "redemption at maturity" under Section 1011(d) of the Tax Reform Act of 1986 and Section 1010(a) of the

Technical and Miscellaneous Revenue Act of 1988 includes certain market discount securities that were redeemed pursuant to the exercise of express call provisions by the applicable issuers of the securities on accelerated maturity dates.

THEREFORE, IT IS ORDERED:

(1) That the Defendant's cross-motion for summary judgment (Filing No. 33) is denied with respect to Category A Securities, but is granted with respect to Category B Securities, and, accordingly, the gain on Category B Securities is taxable at the rate of 34%;

(2) That the Plaintiff's motion for summary judgment (Filing No. 29) is denied with respect to Category B Securities, but is granted with respect to the Category A Securities, and, accordingly, the gain on Category A Securities is taxable at the rate of 31.6%; and

(3) That pursuant to Fed.R.Civ.P. 58, the court will issue judgment for the Plaintiff in accordance with this order and memorandum stating that the Plaintiff is entitled to a tax refund in the amount of $752,270.95, plus the interest payments associated therewith (collectively "Refunded Taxes"), together with statutory interest thereon from the date of payment of such Refunded Taxes on April 21, 1998, as calculated pursuant to 28 U.S.C. § 2411.

---

**2.** 28 U.S.C. § 2411 provides: "In any judgment of any court rendered (whether against the United States, a collector or deputy collector of internal revenue ...) for any overpayment in respect of any internal-revenue tax, interest shall be allowed at the overpayment rate established under section 6621 of the Internal Revenue Code of 1986 upon the amount of the overpayment, from the date of the payment or collection thereof to a date preceding the date of the refund check by not more than thirty days, such date to be determined by the Commissioner of Internal Revenue."